**IN THE UNITED STATES COURT OF APPEALS**

**FOR THE FIFTH CIRCUIT**

No. 97-60531

ROBERT A. STANFORD;  SUSAN STANFORD,

Petitioners-Appellants,

versus

COMMISSIONER OF INTERNAL REVENUE,

Respondent-Appellee.

Appeal from the United States Tax Court

September 3, 1998

Before DUHÉ, BENAVIDES and STEWART, Circuit Judges.

STEWART, Circuit Judge:

This case, which calls for us to construe certain provisions of section 952(c)(1)(C) of the

Internal Revenue Code (the "Code"),[1] involves a dispute regarding the 1990 income tax liability of

Robert A. Stanford and his wife Susan Stanford.[2]  On appeal, the Stanfords challenge a decision of

the Tax Court upholding the Internal Revenue Commissioner's ("Commissioner") assessment of (1)

---

[1]The Code, which is codified at "26 U.S.C.," may hereinafter be cited as "I.R.C."

[2]Susan Stanford is a party to this proceeding because she signed the Stanfords' contested 1990 joint federal income tax return pursuant to I.R.C. § 6013.  Unless otherwise indicated, subsequent references to "Stanford" refer exclusively to Robert A. Stanford.

a tax deficiency against them with respect to their jointly-filed 1990 income tax return and (2) an accuracy-related penalty for their resulting underpayment of tax. See Stanford v. Commissioner, 108 T.C. 344 (1997). For the following reasons, we VACATE the underpayment of tax penalty imposed against the Stanfords and AFFIRM the Tax Court's judgment in all other respects.

**I.**

A. FACTUAL BACKGROUND

The underlying facts of this case are, for the most part, undisputed. Between 1985 and 1987, Stanford, a United States citizen and Houston resident, formed three corporations in the crown colony of Montserrat in the British West Indies, each of which qualified as a "controlled foreign corporation" within the meaning of section 957(a) of the Code. The first corporation, Guardian International Bank, Ltd. ("Guardian Bank"), was incorporated in December 1985 to engage in offshore banking activities. In January 1986, Guardian Bank acquired a banking license from the Montserrat government authorizing it to engage in business as an offshore investment bank.

The second corporation, Guardian International Investment Services, Ltd. ("Guardian Services"), was incorporated in October 1986. Guardian Services' charter authorized it to engage in a broad array of business activities, including real estate development and trademark/patent acquisition. Pursuant to a 1988 written service agreement with Guardian Bank, Guardian Services provided marketing and advertising services to Guardian Bank during 1989 and 1990. The Commissioner concedes that the provision of these services by Guardian Services induced deficits in Guardian Services' earnings and profits for both those years.

Finally, Stanford Financial Group, Inc. ("Stanford Financial") was incorporated in February 1987, with Stanford owning 95 percent of its shares. In relevant part, Stanford Financial's objective

2

was to "carry on the business of a [h]olding [c]ompany" and to "take part in the formation, management, supervision or control of the business operations of any company." Upon incorporation of Stanford Financial, all of the shares of stock of both Guardian Bank and Guardian Services were transferred to Stanford Financial; thus (1) Guardian Bank and Guardian Services became related as brother-sister corporations with (2) Stanford Financial as the common parent. Pursuant to a service agreement with Guardian Bank, Stanford Financial provided administrative and management services to Guardian Bank during 1989 and 1990. The Commissioner concedes that the provision of these services by Stanford Financial induced deficits in Stanford Financial's earnings and profits for both those years.

B. STATUTORY BACKDROP AND THE STANFORDS' 1990 INCOME TAX RETURN

Section 951(a) of the Code requires a United States shareholder of a controlled foreign corporation ("CFC") to include in his gross income his pro rata share of the controlled foreign corporation's "subpart F income" — as defined in section 952 — whether or not such income is distributed to him. I.R.C. § 951(a). A CFC is defined as any foreign corporation where more than 50 percent of the corporation's stock, either by voting power or value, is owned directly, indirectly, or constructively by United States shareholders. I.R.C. § 957(a). Section 951(b) of the Code defines a "United States shareholder" as a United States person who owns directly, indirectly, or constructively 10 percent or more of the voting stock of a foreign corporation. I.R.C. § 951(b). In this case, the parties have stipulated that (1) Stanford is a United States shareholder of Guardian Bank, Guardian Services, and Stanford Financial, and (2) Guardian Bank, Guardian Services, and Stanford Financial are CFCs.

Of the three CFCs in this case, only Guardian Bank realized subpart F income in 1990.

3

Subpart F income is defined in I.R.C. § 952 as including five different types of income, the most pertinent of which, in this case, is "foreign base company income (as determined under section 954)." I.R.C. § 952(a)(2). Section 954(a) defines foreign base company income as including "foreign personal holding company income," I.R.C. § 954(a), which consists of, among other things, dividends, interest, rents, gains from commodity transactions, and foreign currency gains. I.R.C. § 954(c)(1). The parties in this case have stipulated that Guardian Bank's 1990 income included interest, gains on foreign currency exchanges, dividends, and gains on commodity transactions, and that Guardian Bank's resulting subpart F income for that year was $2,789,722. Indeed, the Stanfords reported this figure as Guardian Bank's subpart F income on their 1990 joint federal income tax return.

The amount of subpart F income of a CFC that is ultimately taxed to a United States shareholder may be limited by any of three limitations set forth in I.R.C. § 952(c). The only limitation applicable here is that found in I.R.C. § 952(c)(1)(C), and it is the interpretation of the language of this provision that is at the heart of the dispute in this case. Section 952(c)(1)(C) reads, in pertinent part, as follows:

> (C) <u>Certain deficits of member of the same chain of corporations may be taken into account.</u>--
>
>> (i) <u>In general.</u>--A controlled foreign corporation may elect to reduce the amount of its subpart F income for any taxable year which is attributable to any qualified activity by the amount of any deficit in earnings and profits of a qualified chain member for a taxable year ending with (or within) the taxable year of such controlled foreign corporation to the extent such deficit is attributable to such activity . * * *
>>
>> (ii) <u>Qualified chain member.</u>--For purposes of this subparagraph, the term "qualified chain member" means, with respect to any controlled foreign corporation, any other corporation which is created or organized under the laws of the same foreign country as the controlled foreign corporation but

4

only if--

> (I) all the stock of such other corporation (other than directors' qualifying shares) is owned at all times during the taxable year in which the deficit arose (directly or through 1 or more corporations other than the common parent) by such controlled foreign corporation, or
>
> (II) all the stock of such controlled foreign corporation (other than directors' qualifying shares) is owned at all times during the taxable year in which the deficit arose (directly or through 1 or more corporations other than the common parent) by such other corporation.

I.R.C. § 952(c)(1)(C).[3]    Under section 952(c)(1)(C), a CFC may reduce its subpart F income attributable to a "qualified activity" by the deficits in earnings and profits of a "qualified chain member" to the extent the deficit of the chain member is "attributable to" to such qualified activity.

Relying on retained, expert tax advice, the Stanfords invoked Guardian Bank's section 952(c)(1)(C)(i) election and reduced Guardian Bank's 1990 subpart F income ($2,789,722) by the total deficits in the 1990 earnings and profits of Guardian Services and Stanford Financial, which total they determined to be $1,406,365.[4]  On audit, however, the Commissioner disallowed this reduction as violative of section 952(c)(1)(C).  Notably, the Commissioner conceded (and does not contest on appeal) that (1) Guardian Services and Stanford Financial accumulated deficits in earnings and profits in 1990; (2) these deficits in earnings and profits were generated exclusively through administrative,

---

[3]Section 952(c)(1)(C) was added to the Code in 1988, and was made retroactively applicable to any tax year ending after 1986. See Technical and Miscellaneous Revenue Act of 1988, Pub. L. No. 100-647, § 1012(i)(25)(A), 102 Stat. 3342, 3512.  Thus, subparagraph (i), which has been referred to in commentary as the "TAMRA chain deficit rule," was applicable in 1990, the tax year of the Stanfords at issue in this case.  As discussed infra note 9, a considerably broader "chain deficit rule" was in effect for tax years ending prior to 1987.

[4]Of the total claimed deficit, $1,251,891 was generated by Guardian Services and $154,474 was generated by Stanford Financial.

marketing, or management services provided to Guardian Bank under applicable service agreements; and (3) the deficits accrued to a total of $1,406,365. Such concessions notwithstanding, the Commissioner prohibited the Stanfords from offsetting these deficits against Guardian Bank's subpart F income, determining that (1) Guardian Services was not a "qualified chain member" with respect to Guardian Bank within the meaning of section 952(c)(1)(C)(ii) (and, thus, Guardian Services' deficit in earnings and profits was not deductible vis-à-vis Guardian Bank's subpart F income); and (2) Stanford Financial's deficit, although accrued by a "qualified chain member" with respect to Guardian Bank, was not "attributable to [the same] qualified activity" to which Guardian Bank's subpart F income was attributable (and, thus, was also not deductible vis-à-vis Guardian Bank's subpart F income).[5]

The Commissioner determined the resulting deficiency in the Stanfords' 1990 tax to be $423,531.36. Additionally, because the Stanfords' understatement of tax was substantial, the Commissioner assessed the Stanfords an accuracy-related penalty of $84,706.27 under I.R.C. § 6662(a).[6] The Stanfords filed a petition challenging these determinations in the United States Tax Court.

C. THE TAX COURT'S OPINION

The Tax Court sustained the Commissioner's determinations. First, the court agreed with the Commissioner that Guardian Services was not a qualified chain member with respect to Guardian

---

[5]On their 1990 tax return, the Stanfords also reported a net operating loss carryforward from 1989 of $615,890, which arose, in part, from the Stanfords' reduction of Guardian Bank's 1989 subpart F income of $580,483 by the 1989 deficits in earnings and profits of Guardian Services and Guardian Financial of $385,386. On audit, the Commissioner also disallowed this reduction.

[6]The Commissioner also assessed the Stanfords a late-filing penalty under I.R.C. § 6651(a)(1), which the Tax Court later sustained and the Stanfords do not contest on appeal.

Bank, and therefore the deficits of Guardian Services could not be used to reduce the  subpart F income of Guardian Bank.  The court held that section 952(c)(1)(C)(ii), which defines the term "qualified chain member," provides that CFCs are qualified chain members "only where the CFCs are related to each other directly or indirectly through a single, straight-line chain of corporations, as in a parent-subsidiary relationship, and not where the CFCs are related to each through a common parent, as in a brother-sister relationship."  Because Guardian Services and Guardian Bank were related to each other as brother-sister corporations through their common parent — Stanford Financial — the court concluded that Guardian Services was not a qualified chain member with respect to Guardian Bank.  Accordingly, the court held that Guardian Services' deficit in earnings and profits could not offset Guardian Bank's subpart F income.

With respect to Stanford Financial, the court acknowledged that (1) as Guardian Bank's parent, Stanford Financial was a qualified chain member with respect to Guardi an Bank, and (2) Guardian Bank's subpart F income was "attributable to" the "qualified activity" of banking and financing,[7] but concluded that because Stanford Financial's deficit in earnings and profits arose from the performance of administrative and management services, it was (A) not "attributable to" the

---

[7]I.R.C. § 952(c)(1)(B)(iii)(VI) defines "qualified activity," in pertinent part, as "any activity giving rise to, in the case of a qualified financial institution, foreign personal holding company income." See I.R.C. § 952(c)(1)(B)(iii) (defining "qualified activity" as also including "any activity giving rise to [(1)] foreign base company shipping income, [(2)] foreign base company oil related income, [(3)] foreign base company sales income, [(4)] foreign base company services income, [and (5)] in the case of a qualified insurance company, insurance income or foreign personal holding company income."). The Commissioner conceded below (and does not contest on appeal) that Guardian Bank, by actively engaging in the activity of banking and financing during 1989 and 1990, (1) was a "qualified financial institution" in 1989 and 1990, see I.R.C. § 952(c)(1)(B)(vi), and (2) generated "foreign personal holding company income" during those years, see discussion supra. By definition, that income was subpart F income under the Code. I.R.C. §§ 952(a)(2); 954(a). As such, we find no error in the Tax Court's determination that Guardian Bank's 1989 and 1990 subpart F income was "attributable to" a "qualified activity" within the meaning of section 952(c)(1)(B)(iii).

7

qualified activity to which Guardian Bank's subpart F income was attributable and therefore (B) not deductible against that income. In essence, the Tax Court determined that to be deductible against a related CFC's subpart F income under section 952(c)(1)(C), a qualified chain member's deficit in earnings and profits must be generated through the conducting of a qualified activity, which activity must also have generated the CFC's subpart F income. Because this "identity of activity" requirement was not met in the instant case, the Tax Court held that Guardian Bank's subpart F income could not be reduced by the deficit in earnings and profits of Stanford Financial under section 952(c)(1)(C)(i).

Finally, the Tax Court sustained the Commissioner's determination that the Stanfords were liable for the accuracy-related penalty imposed by I.R.C. § 6662(a) for a substantial understatement of tax. In so holding, the court determined that because no portion of the Stanfords' understatement was attributable to the tax treatment of an item that was supported by "substantial authority," the Stanfords were not entitled to a reduction of the penalty under I.R.C. § 6662(d)(2)(B). Notably, the court did not directly address whether the Stanfords were entitled to a reduction of the penalty under I.R.C. § 6664(c)(1), which section prohibits accuracy-related penalties for any portion of an underpayment with respect to which the taxpayer had reasonable cause and acted in good faith. The Stanfords timely appeal the Tax Court's determinations.

## II.

A. STANDARD OF REVIEW

The focus of this case is on the interpretation and application of section 952(c)(1)(C) of the Code. The Tax Court's determinations of law — for example, interpretations of the statutory

language — are reviewed de novo, while its factual findings are reviewed for clear error. <u>G.M. Trading Corp. v. Commissioner</u>, 121 F.3d 977, 980 (5th Cir. 1997) (citing <u>Bolding v. Commissioner</u>, 117 F.3d 270, 273 (5th Cir. 1997)). "A finding is 'clearly erroneous' when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." <u>Id.</u> (citation omitted). In this case, the facts are essentially undisputed. In such a situation, the question of whether a taxpayer has "substantial authority" for any tax treatment that results in an underpayment of tax, precluding a penalty for substantial understatement of tax, is a legal question reviewed de novo. <u>Westbrook v. Commissioner</u>, 68 F.3d 868, 874, 881-82 (5th Cir. 1995); <u>Little v. Commissioner</u>, 106 F.3d 1445, 1449 (9th Cir. 1997).

B. DISCUSSION

The Stanfords make three arguments on appeal — that (1) Guardian Services is a qualified chain member with respect to Guardian Bank and thus its deficits in earnings and profits may validly reduce Guardian Bank's subpart F income under section 952(c)(1)(C); (2) Stanford Financial's deficits in earnings and profits are "attributable to" the same qualified activity to which Guardian Bank's subpart F income is attributable and thus are also deductible against that income under section 952(c)(1)(C); and (3) a substantial understatement of tax penalty is unwarranted in this case, either because (a) substantial authority exists for their tax treatment of the deficits at issue or (b) any resulting underpayment was due to a reasonable cause and was premised on good faith behavior on their part. We examine each of the Stanfords' arguments in turn.

1. *Qualified Chain Member*

The Stanfords contend that section 952(c)(1)(C)'s statutory language, its legislative history, and a current treasury regulation example support their view that Guardian Services is a "qualified

9

chain member" of Guardian Bank's and that Guardian Services' deficits in earnings and profits are deductible against Guardian Bank's subpart F income. We disagree. As always, we commence our analysis by examining the plain language of the relevant statute, G.M. Trading Corp., 121 F.3d at 981, which in this case is section 952(c)(1)(C). In the absence of any ambiguity, our examination is confined to the words of the statute, which are assumed to carry their ordinary meaning. Id.

Section 952(c)(1)(C)(ii) defines the term "qualified chain member." It provides that a deficit corporation (here, Guardian Services)[8] is a qualified chain member vis-à-vis a CFC with offsettable subpart F income (here, Guardian Bank) if (1) the deficit corporation is organized under the laws of the same foreign country as the CFC, and (2) either one of the two conditions set forth in subparagraphs (I) and (II) of section 952(c)(1)(C)(ii) is satisfied. I.R.C. § 952(c)(1)(C)(ii). In this case, both Guardian Bank and Guardian Services were organized under the laws of Montserrat. As such, resolution of the "qualified chain member" issue depends solely on whether either of the conditions set forth in subparagraphs (I) and (II) was satisfied.

Under subparagraphs (I) and (II), a deficit corporation is a qualified chain member vis-à-vis a CFC with offsettable subpart F income only if the CFC "owns" all the stock of the deficit corporation, or if the deficit corporation "owns" all the stock of the CFC. I.R.C. § 952(c)(1)(C)(ii). Specifically, subparagraphs (I) and (II) provide that the deficit corporation is a qualified chain member of the CFC only if (1) all of the deficit corporation's stock is owned by the CFC either "directly or through 1 or more corporations other than the common parent," I.R.C. §

[8]We use the term "deficit corporation" to refer to any foreign corporation that has a deficit in earnings and profits that is potentially deductible against a CFC's subpart F income under section 952(c)(1)(C)(i), or, where applicable, under prior I.R.C. § 952(d) (1962), see infra note 9 (discussing prior section 952(d)).

952(c)(1)(C)(ii)(I); or (2) all of the stock of the CFC is owned by the deficit corporation either "directly or through 1 or more corporations other than the common parent," I.R.C. § 952(c)(1)(C)(ii)(II).[9]

In this case, neither Guardian Bank nor Guardian Services owned the other's stock directly. Hence, the relevant question becomes whether Guardian Bank or Guardian Services owned *indirectly* all of the other's stock in a way that satisfies the requirements of section 952(c)(1)(C)(ii).[10] In other

---

[9]As such, the focus of section 952(c)(1)(C) is on the stock ownership interests of the CFC and the deficit corporation at issue. By contrast, the old "chain deficit rule" — which was codified in prior section 952(d) and repealed in 1986 — focused on the stock ownership interests of the ultimate taxpayer, the United States shareholder. See I.R.C. § 952(d) (1962), repealed by Tax Reform Act of 1986, Pub. L. No. 99-514, § 1221(f), 100 Stat. 2085, 2554. Under former section 952(d), a CFC with subpart F income and a deficit corporation were part of the same qualified chain of corporations if either corporation was owned directly by "a United States shareholder," and the other was thereby derivatively owned (*i.e.*, indirectly) by such shareholder in the manner specified by treasury regulation section 1.952-1(d)(2)(ii)(b). See Treas. Reg. § 1.952-1(d)(1); Treas. Reg. § 1.952-1(d)(2)(ii) ("A chain of foreign corporations shall, with respect to a United States shareholder, include (a) [a]ny foreign corporation in which such shareholder owns [directly] (within the meaning of section 958(a)(1)(A)) stock but, only to the extent of the stock so owned and (b) [a]ll foreign corporations in which such shareholder owns [indirectly] (within the meaning of section 958(a)(2)) stock, but only to the extent of the stock so owned by reason of his ownership of the stock referred to in (a) of this subdivision.") (emphasis added).

The Tax Court correctly noted that, for all tax years ending prior to 1987, section 952(d) permitted the use of deficits in earnings and profits of deficit corporations in a chain to reduce the subpart F income of a CFC in a chain regardless of the manner by which the deficit corporations and the CFC were related to each other (*i.e.,* regardless of whether the relevant deficit corporation and the CFC had a parent/subsidiary or a brother/sister relationship), as long as each such corporation was directly or indirectly held by the U.S. shareholder (in the manner specified by regulation section 1.952-1(d)(2)(ii)). Such a chain constituted a single chain so long as the relationships between the relevant corporations did not extend back through the United States shareholder to another separate and distinct chain. The government concedes that if prior section 952(d) was applicable to the instant case, Guardian Services would indeed be a "qualified chain member" with respect to Guardian Bank.

[10]It should be emphasized that the stock attribution rules of I.R.C. § 318 — which provide guidance in applying numerous provisions of the Code for which *constructive* ownership of stock is relevant — are immaterial here, as they have not been made applicable to section 952(c)(1)(C)(ii). See I.R.C. § 958(b) (expressly limiting the applicability of section 318's stock attribution rules to the following provisions of subpart F: I.R.C. § 951(b), I.R.C. § 954(d)(3), I.R.C. § 956(c)(2), and I.RC.

11

words, the issue of whether Guardian Services is a qualified chain member with respect to Guardian Bank turns on whether Guardian Bank or Guardian Services owned 100 percent of the other's stock "through 1 or more corporations other than the common parent." I.R.C. § 952(c)(1)(C)(ii). Of course, in this case, such qualifying ownership could flow only through Stanford Financial, which directly owned all of the stock of both Guardian Bank and Guardian Services.

We agree with the Tax Court's final conclusion — that Guardian Services is not a qualified chain member with respect to Guardian Bank and thus its deficit in earnings and profits cannot be used to reduce Guardian Bank's subpart F income. Under the plain language of section 952(c)(1)(C)(ii), a deficit corporation is a qualified chain member vis-à-vis a CFC with offsettable subpart F income only if one completely owns the other "directly" (not applicable in this case) or "through one or more corporations other than the common parent." I.R.C. § 952(c)(1)(C)(ii) (emphasis added). As such, any qualifying *indirect* relationship between a CFC and a deficit corporation cannot flow through "the common parent [corporation]."[11] In this case, involving a

_____

§ 957).

[11]Contrary to the Stanfords' suggestion, section 952(c)(1)(C)'s limitation against indirect ownership "through the common parent" cannot simply be read as a restriction against indirect ownership "through the common United States shareholder." As discussed, the limitation imposes a restriction against otherwise qualifying indirect ownership (*i.e.*, ownership "through 1 or more corporations") of a deficit corporation by a CFC (or vice versa) if such ownership flows "through the common parent." The Stanfords' reading of the limitation — which assumes that the phrase "the common parent" is synonymous with the phrase "the common United States shareholder" — results in a restriction against such ownership only if it runs through the "common United States shareholder." This reading would simply reimpose the limitation against indirect ownership that was part of the old chain deficit rule — *i.e.*, being able to trace a relationship back to a common United States shareholder is not enough to make a deficit corporation and a CFC with offsettable subpart F income part of the same chain.

We find it more plausible to interpret the indirect ownership limitation in section 952(c)(1)(C)(ii) as a restriction against indirect ownership through the common parent corporation, which corporation may or may not be a United States shareholder. The phrase "other than the

12

simple tripartite structure, Guardian Services would be deemed to be an indirect owner of Guardian

Bank only through their common parent corporation, Stanford Financial. Likewise, Guardian Bank

would be deemed to be an indirect owner of Guardian Services only through the same common

parent corporation. Accordingly, read in the light of ordinary understanding, the "other than the

common parent" language of section 952(c)(1)(C) prevents Guardian Services from being a qualified

chain member with respect to Guardian Bank.[12] Because a plain reading of the statute precludes

reaching a contrary result in this case, we need not conduct an analysis of the statute's legislative

history. See Nalle v. Commissioner, 997 F.2d 1134, 1140 (5th Cir. 1993).[13] The Tax Court correctly

---

common parent" clearly modifies the word "corporations" in the phrase which precedes it — namely, "through 1 or more corporations" — and thus the word "parent" is simply a shorthand reference for "parent corporation." See I.R.C. § 952(c)(1)(C)(ii) ("through 1 or more corporations other than the common parent") (emphasis added). We accordingly hold that a CFC's indirect ownership of a deficit corporation (or vice versa) exclusively through a common parent corporation cannot confer "qualified chain member"-status on the deficit corporation.

[12]We express no opinion on whether the Tax Court erred in determining that an indirect relationship with a CFC that triggers "qualified chain member"-status for a deficit corporation under section 952(c)(1)(C)(ii) must be of the "single, straight-line" variety. Even if section 952(c)(1)(C)(ii) contemplates that a non-straight-line indirect relationship may suffice, the plain language of the statute makes clear that such a relationship may not flow through "the common parent [corporation]," thus eliminating Guardian Services' bid to be a qualified chain member of Guardian Bank's.

[13]Noting correctly (1) that prior section 952(d) was repealed in 1986 because of, *inter alia*, congressional concern that deficits in earnings and profits of members within a chain of corporations were being used to reduce subpart F income of CFCs within the chain even though the deficits arose from "a nonsubpart F income category" or "[bore] little or no relation to the income [they offset]," see H.R. Conf. Rep. No. 99-841, at 621-26 (1986), reprinted in 1986 U.S.C.C.A.N. 4075; and (2) that the legislative history of section 952(c)(1)(C) (a) fails to mention the term "qualified chain member" and (b) refers approvingly to deficit corporations and CFCs within "a single chain of corporations" (*i.e.*, the term used to describe a qualified chain of corporations under the pre-1987 chain deficit rule), see S. Rep. No. 100-445 (1988), reprinted in 1988 U.S.C.C.A.N. 4515, 4786, the Stanfords argue that the legislative history of section 952(c)(1)(C) reflects no dissatisfaction with the expansive pre-1987 rule for determining which deficit corporations qualify as chain members for purposes of offsetting a CFC's subpart F income. As alluded to above, however, where — as here — a plain reading of the statute unambiguously precludes a taxpayer's interpretation thereof, no

held that the Stanfords could not reduce Guardian Bank's subpart F income by the deficits in earnings and profits of Guardian Services.[14]

2. *Attributable to Such Qualified Activity*

We next consider whether the Tax Court erred, as the Stanfords claim, when it refused to allow them to reduce Guardian Bank's subpart F income by the deficits in earnings and profits of Stanford Financial, Guardian Bank's parent corporation. As discussed above, section 952(c)(1)(C)(i) provides that a CFC's subpart F income attributable to a qualified activity may be reduced by the deficits in earnings and profits of a qualified chain member to the extent the deficit of the chain member is "<u>attributable to such activity</u>." I.R.C. § 952(c)(1)(C)(i) (emphasis added). The parties agree that (1) Stanford Financial, by directly owning all of the stock of Guardian Bank in 1989 and 1990, was a qualified chain member with respect to Guardian Bank, I.R.C. § 952(c)(1)(C)(ii)(II); (2) Stanford Financial generated deficits in earnings and profits during 1989 and 1990, which deficits arose from the conferral of administrative and management support services to Guardian Bank; and (3) Guardian Bank's subpart F income in 1989 ($580,483) and 1990 ($2,789,722), which consisted

_____

amount of favorable legislative history can rescue the taxpayer's interpretation. <u>Nalle</u>, 997 F.2d at 1140. The Stanfords' argument premised on legislative history must fall short for this reason.

[14]The Stanfords' reliance on treasury regulation section 1.952-1(d)(3), example 1(c), is also misplaced. Example 1(c) was quite obviously intended as an application of the old chain deficit rule contained in section 952(d), and thus its acknowledgment that a sister corporation of a CFC may qualify as a chain member with respect to such CFC is not instructive for purposes of this case. <u>See</u> Treas. Reg. § 1.952-1(d)(3), Example 1(c). Indeed, the paragraph of the regulations that the example attempts to illustrate advises the reader to "[s]ee section 952(d)." <u>See</u> Treas. Reg. § 1.952-1(d)(1). While we are unsure why the example was not withdrawn after Congress' repeal of section 952(d), we are constrained from sustaining the Stanfords' reliance on it because — as established above — it is "plainly inconsistent with the [currently applicable] revenue statute[]," section 952(c)(1)(C). <u>See</u> <u>Brown v. United States</u>, 890 F.2d 1329, 1336 (5th Cir. 1989) (quoting <u>Bingler v. Johnson</u>, 394 U.S. 741, 749-50, 89 S.Ct. 1439, 1444-45, 22 L.Ed.2d 695 (1969)).

14

exclusively of foreign personal holding company income earned through the active conduct of a banking business, was "attributable to [a] qualified activity," I.R.C. §§§ 952(c)(1)(C)(i); 952(c)(1)(B)(iii)(VI); 952(c)(1)(B)(vi); see supra note 7.[15]  Hence, the sole issue on appeal is whether the deficits of Stanford Financial were "attributable to such activity," *i.e.* banking, so that they could be deducted against Guardian Bank's subpart F income on the Stanfords' 1990 tax return.

Our first task, then, is to interpret the phrase "attributable to such activity," and in doing so, we must attempt to give the component words their ordinary, common meaning. G.M. Trading Corp., 121 F.3d at 981. While "[t]he term 'attributable to' has no particular technical significance under the tax laws [—] [indeed,] nowhere in the Internal Revenue Code is such term defined," Lawinger v. Commissioner, 103 T.C. 428, 435 (1994) (punctuation omitted) — it has occasionally been interpreted in case law in both tax and nontax contexts:

> Under the definition of collapsible corporation under section 117(m) of the 1954 Code, the Supreme Court interpreted "attributable to," in the phrase "gain attributable to such property," as "merely confin[ing] consideration to that gain caused or generated by the property in question." Braunstein v. Commissioner, 374 U.S. 65, 70 (1963).  In interpreting the statutory language of section 165(i) of the 1954 Code that governs the ability of taxpayers to claim refunds or credits for property expropriated by the government of Cuba, the District Court of Mississippi held that the normal meaning of one thing to be attributed to another is that one thing is caused or brought about by that other thing. Ogden v. United States, 432 F.Supp. 214, 216 (S.D. Miss. 1975), (citing Webster's Third New International Dictionary), aff'd, 555 F.2d 134 (5th Cir. 1977).  These interpretations are based on the conclusion that "attribute" or "attributable" connotes causation. See National Association of Greeting Card Publishers v. United States Postal Service, et al., 462 U.S. 810, 823 (1983); Watson v.

---

[15]For "qualified financial institutions" such as Guardian Bank, a "qualified activity" is one that "giv[es] rise to . . . foreign personal holding company income." I.R.C. § 952(c)(1)(B)(iii)(VI). Here, the parties agree that Guardian Bank's "qualified activity," through which it generated foreign personal holding company income, was banking. See supra note 7.

> Employment Sec. Commn. of North Carolina, 432 S.E.2d 399, 401
> (N.C. App. 1993). For example, section 6663(a) provides: "If any
> part of any underpayment *** is due to fraud, there shall be added to
> the tax an amount equal to 75 percent of the portion of the
> underpayment which is attributable to fraud." . . . Similarly, the
> accuracy-related penalty provision provides that the penalty applies
> "to the portion of any underpayment which is attributable to"
> negligence, substantial understatement of tax, etc. Sec. 6662(b).

Lawinger, 103 T.C. at 435. Based on this analysis, the Lawinger court found that "the plain meaning

of [the phrase] 'attributable to' is . . . due to, caused by, or generated by." Id. On appeal, the

Stanfords provide no reason why a different meaning should apply to this phrase in the context of this

case.

The Stanfords argue that because the administrative and managerial services provided by

Stanford Financial to Guardian Bank were "driven solely by," "directed solely to," and "in all respects

indispensable to" Guardian Bank's qualified activity of banking, the deficits thereby generated by

Stanford Financial were "attributable to such activity." Because the plain meaning of the phrase

"attributable to" does not embrace the interpretations given to it by the Stanfords, we cannot agree

with their assessment. While there is no question that the deficit-inducing activities of Stanford

Financial were (1) substantially related to Guardian Bank's qualified banking activity and indeed (2)

helped give rise to Guardian Bank's subpart F income attributable to that activity which the Stanfords

now hope to offset, section 952(c)(1)(C)(i) requires more — i.e., a causal relationship between such

activity (banking) and Stanford Financial's deficits — before those deficits may offset that income;

in short, the deficits must have been "caused by" or "generated through" the conducting of the same

qualified activity which generated the subpart F income sought to be offset. While this requirement

may seem an overly strict one, it is one mandated by a plain reading of the phrase "to the extent such

deficit is attributable to such activity" in section 952(c)(1)(C)(i). (emphasis added). Because Stanford

16

Financial's deficits in earnings and profits were not "due to," "caused by," or "generated by" (1) Guardian Bank's qualified banking activity or (2) any similar qualified banking activity conducted by Stanford Financial, those deficits were not "attributable to [the qualified] activity" to which Guardian Bank's subpart F income was attributable. Read in the light of ordinary understanding, section 952(c)(1)(C)(i) thus precludes the Stanfords' ability to offset Guardian Bank's subpart F income by the earnings and profits deficits of Stanford Financial. The Tax Court's decision to this effect is accordingly affirmed.[16]

3. *Accuracy-Related Penalty*

The final issue we address is whether the Tax Court erred in sustaining the Commissioner's determination that the Stanfords are liable for an accuracy-related penalty of $84,706.21 under I.R.C. § 6662. Section 6662 imposes a penalty equal to 20 percent of any "substantial understatement of

---

[16]Once again, the Stanfords' reliance on the legislative history of section 952(c)(1)(C) is mooted by an unambiguous application of the relevant statutory language. The Stanfords argued below that because the legislative history of section 952(c)(1)(C) speaks expressly of curtailing taxpayer reduction of subpart F income of CFCs by deficits in earnings and profits of chain members that "[bear] little or no relationship to [that] income," S. Rep. No. 100-445 (1988), reprinted in 1988 U.S.C.C.A.N. 4515, 4786, section 952(c)(1)(C)(i) clearly contemplates that Stanford Financial's deficits — which indisputably bore "a substantial relationship" to Guardian Bank's banking activity and the income generated therefrom — may be deducted against Guardian Bank's subpart F income. Unfortunately for the Stanfords, not only does the plain language of section 952(c)(1)(C)(i) nullify their argument, see discussion supra, but an example in the legislative history provides further proof that such a deficit offset is available only if the deficit is generated through the conducting of the same qualified activity that generates the income sought to be offset. See id. ("For example, assume that a U.S. corporation owns all the stock of a banking corporation organized in a foreign country, and that the latter owns all the stock of a second banking corporation organized in the same country. The parent foreign bank . . . has subpart F income of $50. The subsidiary foreign bank has a loss of $100 attributable to activities that, when profitable, generate foreign personal holding company income, and has a deficit in earnings and profits of $60. Under [new section 952(c)(1)(C)], the parent foreign corporation may elect to reduce its subpart F income to zero reflecting the subsidiary's deficit.") (emphasis added). As such, were we to even consider the legislative history of section 952(c)(1)(C), we could not find it to be unequivocally in favor of the Stanfords' position.

17

income tax." See I.R.C. §§ 6662(a); 6662(b). It is undisputed that the Stanfords' income tax deficiency that we affirmed in Sections II.B.1 and II.B.2 of this opinion was a "substantial understatement" of tax as defined by I.R.C. § 6662(d)(1)(A). Nonetheless, the statute provides that the amount of an understatement against which the penalty is imposed shall be reduced by the portion of the understatement that is attributable to (1) tax treatment that was supported by "substantial authority," or (2) tax treatment for which (a) there is a "reasonable basis" and (b) the relevant facts were "adequately disclosed in the return or in a statement attached to the return." I.R.C. § 6662(d)(2)(B). Furthermore, I.R.C. § 6664(c)(1) provides that "[no] penalty shall be imposed . . . with respect to any portion of an underpayment if it is shown that there was a reasonable cause for such portion and . . . the taxpayer acted in good faith with respect to such portion." I.R.C. § 6664(c)(1).[17] Finding a lack of substantial authority to support the Stanfords' reduction of Guardian

_____

[17]Added to the Code in 1989, section 6664 is applicable to all tax returns due after December 31, 1989 (determined without regard to extensions). See Revenue Reconciliation Act of 1989, Pub. L. No. 101-239, § 7721(d), 103 Stat. 2106, 2400. The Stanfords' 1990 income tax return was due in 1991. Consequently, assuming the Stanfords invoked section 6664 below, the reasonable cause/good faith defense in subsection (c)(1) is pertinent to resolving whether the understatement penalty at issue — stemming from the Stanfords' 1990 return — is warranted. Prior to the enactment of section 6664, the reasonable cause/good faith defense was contained in I.R.C. § 6661(c), which read as follows:

> (c) Authority to waive.-- The Secretary may waive all or any part of the addition to tax provided by this section[, *i.e.,* the accuracy-related penalty,] on a showing by the taxpayer that there was reasonable cause for the understatement (or part thereof) and that the taxpayer acted in good faith.

I.R.C. § 6661(c) (repealed in 1989). As such, prior to the applicability of section 6664, the Commissioner had discretion whether to waive the substantial understatement penalty on account of a taxpayer's (a) reasonable cause for the understatement and (b) good faith actions, and our review of the Commissioner's decision was for abuse of that discretion only. See Heasley v. Commissioner, 902 F.2d 380, 384-85 (5th Cir. 1990).

18

Bank's 1989 and 1990 subpart F income by the deficits in earnings and profits of Guardian Services and Stanford Financial, the Tax Court refused to set aside the accuracy-related penalty imposed against them by the Commissioner. On appeal, the Stanfords request a reversal of this penalty, contending either that (1) their tax treatment of the deficits was supported by substantial authority, or (2) any substantial understatement of tax resulting from this treatment was due to a reasonable cause and supported by good faith behavior on their part.

We need not resolve the Stanfords' "substantial authority" argument because we accept their alternative one — that the underpayment of tax resulting from their treatment of the deficits of Guardian Services and Stanford Financial was due to a reasonable cause and supported by good faith actions. We accordingly vacate the accuracy-related penalty imposed against them. See I.R.C. § 6664(c)(1). According to the applicable regulations, "the extent of the taxpayer's effort to assess [his] proper tax liability" is "[g]enerally[] the most important factor" in determining reasonable cause and good faith. Treas. Reg. § 1.6664-4(b); see Streber v. Commissioner, 138 F.3d 216, 223 (5th Cir. 1998) (citing Heasley, 902 F.2d at 385). Additional "[c]ircumstances that may indicate reasonable cause and good faith include [(1)] an honest misunderstanding of fact or law that is reasonable in light of all the facts and circumstances, including the experience, knowledge, and education of the taxpayer," Treas. Reg. § 1.6664-4(b), and (2) reliance on the advice of a professional tax advisor "if, under all the circumstances, such reliance was reasonable and the taxpayer acted in good faith," id.; Reser v. Commissioner, 112 F.3d 1258, 1271 (5th Cir. 1997).

Here, the Commissioner acknowledges that the Stanfords relied on the advice of attorney Kenneth Allen, an expert in international banking law, in setting up their Montserrat offshore banking enterprise. Nothing in the record indicates that the heeded advice, which called for the utilization of

19

a tripartite corporate structure consisting of Guardian Bank, Guardian Services, and Stanford Financial, had as a purpose the facilitation of tax avoidance. More importantly, the Commissioner does not dispute that the Stanfords' 1990 tax return reporting the income and deficits from this enterprise was prepared by Harry Failing ("Failing"), an experienced CPA who (1) served as the Stanfords' principal tax advisor and regular tax-return preparer, and who (2) prior to starting his own extensive tax compliance practice, worked for Price Waterhouse in an office where he alone comprised "the international tax department." At trial, Failing testified that before preparing the Stanfords' return he (1) reviewed the business and tax records of Guardian Bank, Guardian Services, and Stanford Financial; (2) studied the language of section 952(c)(1)(C), the section's legislative history, and what he considered to be the applicable regulations; and (3) concluded that the Stanfords could deduct under section 952 the deficits in earnings and profits of Guardian Services and Stanford Financial against Guardian Bank's subpart F income on their 1990 tax return. On appeal, the Commissioner does not allege that the Stanfords failed to advise Failing of any facts material to the determination of their 1990 tax liability or limited the scope of his research in any way. See Treas. Reg. § 1.6664-4(c)(1).

Although Mr. Stanford stated at trial that he was "not an unsophisticated taxpayer," it is not reasonable under the above-stated facts to expect that the Standfords could "monitor [Failing,] [their] independent advisor[,] to make sure [he] [conducted] sufficient research to give knowledgeable advice." Mauerman v. Commissioner, 22 F.3d 1001, 1006 (10th Cir. 1994). "It is for exactly this reason that many intelligent investors hire independent, educated experts to advise them," particularly with respect to arcane matters of tax law such as those at issue in this case. Id. (emphasis added); see also Chamberlain v. Commissioner, 66 F.3d 729, 733 (5th Cir. 1995) ("To require the taxpayer

20

to challenge the [expert], to seek a 'second opinion,' or to try to monitor [the expert] on the provisions of the Code himself would nullify the very purpose of seeking the advice of a presumed expert in the first place.") (quoting United States v. Boyle, 469 U.S. 241, 251, 105 S.Ct. 687, 692-93, 83 L.Ed.2d 622 (1985)). Here, Failing satisfied himself that the deficits of Guardian Services and Stanford Financial could offset Guardian Bank's subpart F income under section 952(c)(1)(C), and the Stanfords had reasonable cause, because o f his extensive expertise in the field of international taxation, to trust his advice. Although Failing's legal interpretation of section 952(c)(1)(C) turned out ultimately to be incorrect — and indeed gave rise to a substantial understatement of tax on the Stanfords' 1990 joint return — we find that the Stanfords' reliance on that interpretation constitutes "reasonable cause" for purposes of precluding the penalty imposed against them for that understatement. See Boyle, 469 U.S. at 250, 105 S.Ct. at 692 ("'[R]easonable cause' is established when a taxpayer shows that he reasonably relied on the advice of an accountant or attorney that it was unnecessary to file a return, even when such advice turned out to have been mistaken."). Accordingly, the Tax Court's affirmance of the Stanfords' accuracy-related penalty is reversed.[18]

_____

[18]As is evident from our discussion above, we do not accept the Commissioner's contention that the Stanfords waived their reasonable-cause-for-underpayment argument by failing to adequately raise it in the court below. Noting that "to be preserved, an argument must be pressed, and not merely intimated," In re Fairchild Aircraft, 6 F.3d 1119, 1128 (5th Cir. 1993) (citation omitted), the Commissioner insists that the Stanfords' "passing references" to the reasonable cause argument in the Tax Court were insufficient to preserve this argument for review, especially given the fact that the Tax Court failed to rule on it. Unfortunately for the Commissioner, he reads the above-cited language in Fairchild out of context. In particular, we highlight the sentences both preceding and following the language that the Commissioner isolates:

> Citing cases that may contain a useful argument [(*i.e.*, by implication)] is simply inadequate to preserve that argument for appeal; to be preserved, an argument must be pressed, and not merely intimated. In short, the argument must be raised to such a degree that the trial court may rule on it.

21

Id. at 1128 (quotations omitted) (emphasis added).

Here, the Stanfords did considerably more than present their reasonable cause argument by implication through case cites; they "identified [it] by name," and even "advocated [it]." Id. For instance, in their original petition to the Tax Court, the Stanfords asserted error in the Commissioner's finding that they "substantially understated income without substantial authority and without reasonable cause." (emphasis added). In their trial memorandum, the Stanfords listed five distinct issues, one of which was "[w]hether [they] substantially understated income without substantial authority and without reasonable cause, and are liable for the penalty under I.R.C. § 6662(a)." (emphasis added). During opening arguments, (1) the Stanfords' counsel (a) stated that "the issues in controversy in this case [include] . . . whether [the Stanfords] substantially understated income without substantial authority and without reasonable cause, and (b) averred that "the accuracy-related penalty . . . does not apply here [because] the evidence will show that [the Stanfords] exercised due care in the development of the position they elected . . . [on] their return;" and (2) the Commissioner's counsel, recognizing reasonable cause to be an issue, contended that "[the Stanfords made] no reasonable attempt to comply with the law." (emphasis added). As discussed above, at trial the Stanfords' counsel elicited testimony (1) from Stanford establishing that he regularly relied on tax practitioners, particularly Failing, for tax advice and return preparation; and (2) from Failing establishing his (Failing's) (a) expertise in tax law and (b) the reasoning he followed to reach the tax position advanced on the Stanfords' joint return. Indeed, such evidence could only be relevant to the reasonable cause issue, as the only other issue in dispute concerning the penalty — i.e., whether substantial authority existed for the Stanfords' tax position — would be resolved, had we reached it, under an objective standard, see Treas. Reg. § 1.6662-4(d)(2); in other words, the Stanfords' reliance on Failing's expertise would be immaterial to resolving the "substantial authority" issue. Finally, the parties post-trial pleadings continued to address the reasonable cause issue. The Stanfords' post-trial brief listed the issue as contested, while the Commissioner's argued that a finding of reasonable cause was unwarranted due to the Stanfords' level of education and investment experience. In their post-trial reply brief, the Stanfords responded:

> [The] Commissioner ignores the engagement of a highly qualified Certified Public Accountant in reviewing case law, the Regulations, the Internal Revenue Code and the legislative history. The facts and circumstances are replete in the trial record and adequately cited in the original Brief for Petitioner. The Commissioner relies solely on the fact that Mr. Stanford and his Certified Public Accountant were highly educated and sophisticated as evidence of Petitioners' bad faith and unreasonableness. The Commissioner offered no evidence through testimony that the Taxpayers did not act in good faith as provided by the Internal Revenue Code. The record is replete with Taxpayers' good faith and reasonable cause and the relevant facts supporting this view are adequately cited in the original Brief for Petitioner.

(emphasis added). In his appellate brief, the Commissioner acknowledges that questioning Stanford about his "education and level of business sophistication. . . went to the issue of reasonable cause."

Under these circumstances, we find that (1) the Stanfords sufficiently pressed their reasonable cause argument in the Tax Court — i.e., by raising it in their pleadings and introducing relevant evidence at trial — and thus did not waive it, see Sealy Power, Ltd. v. Commissioner, 46 F.3d 382,

## III.

In summary, we hold that (1) because Guardian Services is not a qualified chain member with respect to Guardian Bank, the Tax Court correctly sustained the Commissioner's determination that the Stanfords may not offset Guardian Bank's subpart F income by the deficits in earnings and profits of Guardian Services; (2) because the deficits in earnings and profits of Stanford Financial are not attributable to the same qualified activity to which Guardian Bank's subpart F income is attributable, the Tax Court correctly sustained the Commissioner's determination that the Stanfords may not offset Guardian Bank's subpart F income by the deficits in earnings and profits of Stanford Financial; and (3) because the Stanfords had reasonable cause and acted in good faith with respect to the understatement of tax resulting from the disallowance of the aforementioned offsets, the Tax Court incorrectly sustained the Commissioner's determination that the Stanfords are liable for an accuracy-related penalty under section 6662(a).  Accordingly, we VACATE the Stanfords' underpayment of

---

398-99 (5th Cir. 1995) (although trial focused on a different issue, issue of non-deductibility of certain expenses not waived by Commissioner where Final Partnership Administrative Adjustment disallowed expenses; Commissioner raised non-deductibility issue in trial memorandum; partnership addressed the issue in its own trial memorandum; and Commissioner mentioned issue in opening argument); United States v. Blakeman, 997 F.2d 1084, 1093-94 (5th Cir. 1992), cert. denied, 510 U.S. 1042, 114 S.Ct. 687, 126 L.Ed.2d 654 (1994) (although taxpayer did not raise I.R.C. § 7520 issue at trial, issue not waived where taxpayer raised it in proposed findings of fact and conclusions of law and resolution of issue did not require presentation of evidence); Laney v. Commissioner, 674 F.2d 342, 350-351 (5th Cir. 1982) (although taxpayers failed to plead recapture argument before the Tax Court, issue not waived because taxpayers included it in their trial memorandum to the court); (2) the Tax Court was capable of addressing the Stanfords' argument when ruling on their claims; and (3) the Tax Court's failure to do so does not operate to the Stanfords' detriment, see Laney, 674 F.2d at 351 ("Although the Tax Court did not address the issue, its failure should not unfairly penalize the [taxpayer].").

23

tax penalty and AFFIRM the Tax Court's judgment in all other respects.

BENAVIDES, J., concurring in part and dissenting in part:

I agree with my colleagues that Guardian Services is not a qualified chain member with respect to Guardian Bank and that Guardian Services' deficits therefore cannot be used to offset Guardian Bank's subpart F income for tax purposes. I also agree that the Stanfords had reasonable cause and acted in good faith with respect to the understatement of their 1990 tax liability and consequently should not be assessed an accuracy-related penalty. I concur in the majority's reasoning in reaching those conclusions and write separately only to voice my dissent on the issue of whether the deficits of Stanford Financial were "attributable to" the qualified activity of Guardian Bank within the meaning of 26 U.S.C. § 952(c)(1)(C)(i). I would hold that Stanford Financial's deficits were attributable to the qualified activity of Guardian Bank, and that the Stanfords therefore should be allowed to offset the income of the latter by the losses of the former.

It is undisputed that Stanford Financial is a qualified chain member with respect to Guardian Bank, that Stanford Financial generated deficits of $154,474 during the 1990 tax year as a result of providing administrative and management services to Guardian Bank, and that those services supported a "qualified activity" (banking) within the meaning of 26 U.S.C. § 952(c)(1)(B)(iii). Thus, the only question before us is whether those deficits are attributable to that qualified activity. The majority defines "attributable to" to mean "due to, caused by, or generated by"--a definition I accept. I do not, however, believe it is significant that the Stanfords say Stanford Financial's deficits were "driven solely by" and "directed solely to" Guardian Bank's qualified activity rather than using the words "due to, caused by, or generated by." It seems clear that their point is that administrative and management services are "attributable to" the activity they support and this seems to me, as a matter of the plain meaning of the phrase, to be true. The majority seems to be construing the phrase

"attributable to" so strictly as to implicitly require that deficits offset pursuant to § 952(c)(1)(C)(i) be generated by an entity itself engaged in a qualified activity--a view which I believe misreads the provision.  Because I believe that the costs of administrative and management services provided in support of a qualified activity are caused by a qualified activity, I would find that the Stanfords should be allowed to use the deficits of Stanford Financial to offset the profits of Guardian Bank for purposes of computing their 1990 tax liability.