IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

_____

No. 98-60455
_____

DENNIS GANDY,

                    Petitioner-Appellant,

v.

COMMISSIONER OF INTERNAL REVENUE,

                    Respondent-Appellee.

--------------------

DENNIS GANDY; CAROLYN S. GANDY,

                    Petitioners-Appellants,

v.

COMMISSIONER OF INTERNAL REVENUE,

                    Respondent-Appellee.

_____

Appeal from the Decision of the
United States Tax Court
(26018-93)
_____

October 22, 1999

Before KING, Chief Judge, STEWART, Circuit Judge, and ROSENTHAL,
District Judge[*].

PER CURIAM:[**]

_____

    [*] District Judge of the Southern District of Texas, sitting
by designation.

    [**] Pursuant to 5TH CIR. R. 47.5, the court has determined
that this opinion should not be published and is not precedent
except under the limited circumstances set forth in 5TH CIR. R.
47.5.4.

Petitioners-appellants Dennis and Carolyn Gandy appeal from a decision of the United States Tax Court upholding tax deficiencies and fraud penalties assessed by the Commissioner of Internal Revenue, the Respondent-appellee.  We affirm.

I.

From 1985 through 1987, Dennis Gandy and his wife, Carolyn (the "Gandys" or "taxpayers"), operated the Dennis Gandy Nursery (the "Nursery"), which sold trees throughout the southwest. After the Gandys' divorce in 1988, Dennis continued to operate the Nursery.  The Nursery grew most of its products and employed laborers to work the fields.  During the earlier years at issue, taxpayers paid the laborers in cash.  The laborers  were transported from Mexico by persons known as "coyotes" who charged $500 to $1000 per laborer.  The Nursery advanced the Mexican laborers the coyote payments in cash and then deducted payments from their wages to recover the advance.  Beginning in mid-1987, the workers were paid by check.

The Nursery's customers included local "walk-in" customers as well as large chain stores such as WalMart.  The Nursery owned its own delivery trucks and employed drivers to ship trees to its chain store customers.  Taxpayers gave their drivers cash advances to pay for travel expenses, but the drivers were required to bring back receipts.  If a particular cash advance exceeded a driver's total receipts, the difference was deducted from the driver's paycheck.  Eventually, drivers began using credit or checks to pay for fuel, rather than cash.

2

Throughout the years in issue, taxpayers employed the same office procedures. They generated invoices for the chain stores from a computer and recorded these invoices in a set of ledgers referred to as "deposits" or "chain store" ledger. The taxpayers used hand-written or typed invoices for walk-in customers. These invoices were not entered into the computer but were kept in a ledger, the "walk-in" ledger, separate from the chain store ledger. Gross receipts from the chain store ledger generally were deposited into the Nursery's bank account and reported on the taxpayers' income tax returns, while gross receipts from the walk-in ledger generally were not deposited into the Nursery account and not reported on the taxpayers' returns. Each day, one of the Nursery employees made deposits and cashed checks that were usually associated with the walk-in ledger. Mrs. Gandy instructed the employee to limit the checks cashed to an amount less than $10,000 in order to avoid reports of currency transactions to the Internal Revenue Service ("IRS"). The cash proceeds from the walk-in ledger were turned over to the taxpayers. Sometimes, Mr. Gandy made cash payments to the field laborers out of these proceeds.

In 1985, taxpayers began lending money to individuals, generally for the purchase or construction of residential properties or commercial buildings. They used funds from the Nursery receipts to make many of these loans. An attorney or title company assisted in drawing up documents and conducting settlement for some loans, but the taxpayers often disbursed the

3

funds in cash or check directly to the borrowers.  Taxpayers maintained a bank account that was used primarily for conducting these lending activities.  All deposits to the account were made in cash until 1987 when deposits began to include mortgage payment checks from borrowers.  All checks written on the account were payable to mortgage borrowers, with the exception of one to Mrs. Gandy and one to the Nursery.

Taxpayers maintained other personal accounts during the years in issue.  Each was primarily funded by checks from the Nursery's account.  Dennis Gandy's father, Burnice Gandy, also maintained a personal account.  During 1985 and 1986, deposits to this account consisted almost exclusively of his social security and Veterans' disability benefits.  In 1987, however, large sums began to be deposited into his account consisting of checks payable to the Nursery, checks written by taxpayers' loan borrowers, and cash.  Equally large sums were withdrawn from Burnice Gandy's account and deposited into the Nursery's account. Taxpayers told their accountants that the funds drawn on this account were loans from Burnice Gandy to Dennis Gandy.

In 1988, after taxpayers' divorce, Dennis Gandy used currency and Nursery gross receipts to open another personal account styled "Burnice and Dennis Gandy."  Cash and checks payable to the Nursery were deposited into the account during 1988 and 1989.  Most of the amount deposited was withdrawn and deposited into the Nursery's account.  Again, Dennis Gandy told his accountant that the funds drawn on this account were loans

4

from Burnice Gandy.

On November 1, 1989, the IRS conducted a search, pursuant to a warrant, of the Nursery and a consensual search of taxpayers' residence. Both taxpayers were indicted for willfully making and subscribing false tax returns for 1985, 1986, and 1987. On September 4, 1992, each taxpayer pleaded guilty and was convicted of subscribing a false tax return for 1987.

On September 21, 1993, the Commissioner of Internal Revenue ("Commissioner") mailed a notice of deficiency to Dennis and Carolyn Gandy for the years 1985 through 1987. He determined federal income tax deficiencies, as well as additions to tax under I.R.C. § 6653(b), for fraud, and under I.R.C. § 6661, for substantial understatement of tax liability. On the same date, the Commissioner mailed a notice of deficiency to Dennis Gandy for the years 1988 and 1989. He determined tax deficiencies, as well as additions to tax under I.R.C. § 6653(b) and § 6663,[1] for fraud, and under I.R.C. § 6661, for substantial understatement of tax liability.

Dennis and Carolyn Gandy filed a timely petition in the United States Tax Court seeking redetermination of the deficiencies and additions to tax for 1985 through 1987, and Dennis Gandy filed a petition seeking redetermination of the deficiencies and additions to tax for 1988 and 1989. The Tax Court consolidated the petitions and tried the case over a period

---

[1]The fraud penalty under I.R.C. § 6653(b) was recodified at I.R.C. § 6663 for returns due after December 31, 1988.

5

of three days.  The presiding judge, Edna Parker, died before rendering an opinion.  The case was reassigned to Chief Judge Mary Ann Cohen to be resolved on either the evidence in the record or after a new trial.  The parties unconditionally consented in writing to the submission of the consolidated cases on the record.

On December 1, 1997, the court issued a careful, thorough opinion finding that the Commissioner had proved the existence of an underpayment for each of the years at issue and that each underpayment was due to the taxpayers' fraud.  The Tax Court found that the taxpayers knew their bookkeeping methods would result in underreporting of income and that their use of cash was intended to conceal income and assets.  Further, the Tax Court rejected taxpayers' contention that a substantial portion of the cash was used for deductible labor and transportation expenses, expenses that they did not try to claim until trial.  The court upheld much of the Commissioner's deficiency determinations but, despite its skepticism, allowed taxpayers an additional $100,000 deduction for labor expenses in 1985 and in 1986 and an additional $50,000 deduction for labor expenses in 1987.  The taxpayers filed a timely notice of appeal.

II.

We review the Tax Court's determinations of law de novo and its findings of fact for clear error.  See Stanford v. Commissioner, 152 F.3d 450, 455 (5th Cir. 1998).  It is well

6

settled that "[a] finding is 'clearly erroneous' when although there is evidence to support it, the reviewing court on the entire record is left with the definite and firm conviction that a mistake has been committed." Anderson v. City of Bessemer City, 470 U.S. 564, 573 (1985) (quoting United States v. United States Gypsum Co., 333 U.S. 364, 395 (1948)).

The Commissioner bore the burden of proving by clear and convincing evidence (1) that underpayments existed for each year in issue and (2) that each underpayment was due to fraud. See I.R.C. §§ 7454(a), 6501(c)(1); Toussaint v. Commissioner, 743 F.2d 309, 312 (5th Cir. 1984). With respect to the Commissioner's first burden, taxpayers admitted to having unreported income for the years in issue. The Commissioner reconstructed their income for those years to determine the amount that was unreported. Based on these reconstructions, the Commissioner determined the tax deficiencies. Taxpayers challenged the determinations, contending that they had additional unclaimed deductions for labor and transportation expenses, which were paid in cash and substantially offset their unreported income. To the extent their unreported income and use of cash were intertwined with the allegations of fraud, taxpayers claim error in the Tax Court's treatment of the issue of expense deductions.

First, taxpayers argue that, once the Commissioner presented evidence of unreported receipts, the Tax Court improperly shifted the burden of proof to them to explain the receipts. Instead,

7

they contend, the Commissioner retains the burden of uncovering their unclaimed deductions and the Commissioner discharges this duty by following any lead the taxpayers might have provided. This is incorrect.

When the Commissioner uses circumstantial evidence and approximations to prove that income was not reported, as with the net-worth method, the Commissioner has a duty to investigate reasonable leads that might more accurately establish the figures upon which the indirect method is based.  See Holland v. U.S., 348 U.S. 121, 135-37, 137 (1954); Yoon v. Commissioner, 135 F.3d 1007, 1012 (5th Cir. 1998); Fairchild v. Commissioner, 240 F.2d 944, 947 (5th Cir. 1957).  The Commissioner has no such duty when proof of unreported income is directly established by reference to specific, unreported items in the taxpayer's records.  See United States v. Suskin, 450 F.2d 596, 598 (2d Cir. 1971); United States v. Shavin, 320 F.2d 308, 311 (7th Cir. 1963) (citing Swallow v. United States, 307 F.2d 81 (10th Cir. 1962)); United States v. Stayback, 212 F.2d 313, 317 (3d Cir. 1954).

The Gandys claim to have incurred deductible labor and transportation expenses in 1985, 1986, and 1987.  The Commissioner used the specific-items method to reconstruct their income for these years and, therefore, had direct evidence of the taxpayers' unreported receipts.  That evidence satisfied the Commissioner's burden of proving an underpayment.  The Tax Court, then, properly placed the burden on the taxpayers to explain those receipts, applying the settled rule:  "[E]vidence of

unexplained receipts shifts to the taxpayer the burden of coming forward with evidence as to the amount of offsetting expenses, if any." Siravo v. United States, 377 F.2d 469, 473 (1st Cir. 1967).

Second, taxpayers contend that the Tax Court erred by discounting their evidence regarding profit margins, labor costs, and transportation expenses. They allege that the Commissioner overstated their profit margins for the years 1985 through 1987. Evidence to this effect, they argue, indicates the existence of their deductible travel and labor expenses for those years. Taxpayers' evidence that their profit margins were overstated included the testimony of three of their competitors in the nursery business. These witnesses were not certified as experts, spoke only to profits and expenses in their own businesses, and admitted they had never examined the Gandys' records. As stated above, it was the taxpayers' burden to establish the amount of their offsetting expenses. Evidence of other people's records does not satisfy that burden, and the Tax Court was not in error for concluding as much.

Taxpayers challenge the profit margin determination on another ground. They argue that the Commissioner should have corroborated the numbers by resort to another method of reconstruction. Doing so, they maintain, would have proven that the profit margin was overstated. Upon finding that the profit margin was overstated, the Commissioner should have followed that "lead" to conclude that taxpayers must have had additional

9

unclaimed expenses.  This contention is wholly without merit.

When a taxpayer's books and records are incomplete or do not

accurately reflect income, the Commissioner is authorized to use

any method deemed appropriate to reconstruct the taxpayer's

income.  See I.R.C. § 446(b); Webb v. Commissioner, 394 F.2d 366,

371-72 (5th Cir. 1968).  Further, the Commissioner is not

required to corroborate these results by using several methods.

See Gordon v. Commissioner, 63 T.C. 51, 78 (1974), modified, 63

T.C. 501 (1975), rev'd in part on other grounds, 572 F.2d 193

(9th Cir. 1977).  And, again, the Commissioner established a

prima facie case of underpayment with evidence of unreported

income.  It was then the taxpayers' duty to follow their own

"leads."[2]

With respect to the Commissioner's second burden, taxpayers

contend that the Tax Court's finding of fraudulent intent was

clearly erroneous.  They argue that they were unsophisticated,

they relied on their accountants, they were merely negligent,

and, although they wore several "badges of fraud," they failed to

wear others.  We have reviewed the record and the Tax Court's

opinion, and we note that these same contentions were ably

addressed below.  On appeal, moreover, taxpayers have again

failed to specify error in the more damaging indicia of fraud

found by the Tax Court.  We think it unnecessary to recount these

---

[2]In a display of unusual generosity, the Tax Court did permit deductions for the years 1985 through 1987, despite the taxpayers' inability to proffer concrete evidence regarding their expenses.  Taxpayers' dissatisfaction with the numbers adds little to merit reversal.

10

findings, since they too were ably addressed below, but we conclude that they are not clearly erroneous.

Finally, taxpayers assert that Judge Cohen's opinion was based on a clearly erroneous interpretation of the original record. Their claim of error is twofold. First, they contend that Judge Cohen mischaracterized the evidence in the record and such mischaracterization indicates that she did not base her opinion on the record. We too have examined the record and conclude that it more than adequately supports her opinion. Her characterizations of the evidence were not clearly erroneous.

Second, taxpayers maintain that Judge Cohen's interpretation of the record was erroneous because she failed to recall witnesses and, instead, made credibility determinations based on the record alone. This argument is without merit. Taxpayers filed an unqualified consent to submission on the record, choosing to forego the option of a new trial. They cannot now claim error because the opinion was based on the record rather than live testimony.

### III.

For the foregoing reasons, we AFFIRM the judgment of the Tax Court.