United States Court of Appeals,

Fifth Circuit.

No. 96-60112.

Dennis E. BOLDING;  Dixie R. Bolding, Petitioners-Appellants,

v.

COMMISSIONER OF INTERNAL REVENUE, Respondent-Appellee.

July 18, 1997.

Petition for Review of a Decision of the United States Tax Court.

Before REAVLEY, GARWOOD and BENAVIDES, Circuit Judges.

GARWOOD, Circuit Judge:

This appeal involves disputed deficiencies in the income tax returns of appellants Dennis and Dixie Bolding, husband and wife, for the taxable years 1988, 1989, and 1990.  The Boldings filed a petition contesting the deficiencies in the United States Tax Court.  The court entered a memorandum opinion, unofficially reported at 70 T.C. (CCH) 110, rendering a decision in favor of the Commissioner of Internal Revenue (Commissioner).  We reverse.

**Facts and Proceedings Below**

In the late 1970s, Dennis Bolding (Taxpayer)[1] began a cattle ranch operation, breeding and selling cattle for the meat market. Taxpayer was advised by his accountant that he should conduct his cattle ranching operation through a corporation for liability purposes.  Accordingly, in August 1983 Taxpayer formed Three Forks

_____

[1]References to "Taxpayer" in the singular are to Dennis Bolding;  Mrs. Bolding is a party to this case solely because she filed joint income tax returns with her husband for the years at issue.

1

Land & Cattle Company (Three Forks), a Texas corporation which periodically engaged in both the commercial and the registered cattle businesses.[2] The corporation was structured as a Subchapter S corporation, and at all times was wholly owned by Taxpayer, who was its president.

Prior to 1990, Taxpayer had lent approximately $500,000 to Three Forks, money which he had obtained from the sale of his prior businesses, including a beer distributorship and a ranch. Although these loans were recorded in Three Forks' books and records as loans from a shareholder, no promissory notes for these loans were prepared or executed. Sometime during 1990, Taxpayer and his accountant realized that Three Forks would not be able to repay Taxpayer the money he had lent it. As a result, the indebtedness for the money previously advanced as a loan to Three Forks was contributed by Taxpayer to the capital of the corporation.

At the beginning of 1990, Taxpayer leased a ranch known as the Hopper Ranch. He needed additional funds to purchase cattle to stock his ranching operation. He contacted the Citizens State Bank of Lometa in Lometa, Texas (Bank), and explained that he wanted a loan to fund his cattle operation. The Bank required Taxpayer to submit a personal financial statement and a proposed operating statement showing the planned use of the funds. Pursuant to the Bank's request, Taxpayer submitted his personal financial statement

_____

[2]The commercial cattle business involves breeding cows and selling the calves to the meat market, while the registered cattle business involves raising and sometimes selling cattle for breeding purposes.

2

(showing a net worth in excess of $2,000,000, with over $200,000 cash on hand) and proposed operating statement, explaining the need for and his proposed use of the funds. The proposed operating statement indicated that Taxpayer wanted the loan to fund a "cow-calf operation" in which he would purchase 400 cows and 20 bulls and graze them on 4,800 acres. He asked for a line of credit from the Bank in the amount of $250,000. No financial information with respect to Three Forks was asked for or submitted.

The Bank approved the $250,000 line of credit and prepared a promissory note, which Taxpayer signed, naming "Dennis E. Bolding d/b/a Three Forks Land & Cattle Co." as the maker-borrower. The Bank also required the filing of a security agreement and a UCC-1 financing statement. The security agreement was signed "Dennis E. Bolding d/b/a Three Forks Land & Cattle Co.," and provided the Bank with a security interest in the cows and bulls that were to be acquired with the funds borrowed under the line of credit. The UCC-1 statement, however, was signed by Taxpayer simply as "Dennis E. Bolding."

Taxpayer believed that he was borrowing the funds in his personal capacity and not on behalf of Three Forks. Also, the Bank indicated that it was making the loan to Taxpayer alone and based upon his personal credit. None of the loan documents prepared by the Bank was prepared for Three Forks as debtor, nor were any signed by anyone on behalf of the corporation.[3]

_____

[3]In addition to the $250,000 loan, the Bank also made other loans to Taxpayer and Three Forks during 1990. On March 8, 1990, the Bank lent $25,000 to Taxpayer individually. The note was made

The funds were disbursed directly from the Bank to Three Forks' corporate account and were used by Three Forks to purchase cattle.[4]  Principal and interest payments were made to the Bank from time to time with respect to the $250,000 line of credit. Such principal and interest payments to the Bank were made by checks drawn on Three Forks' account.

By the end of 1990, the total amount outstanding on the line of credit, net of all repayments, was $223,000.  The line of credit was rolled over into later years, after its initial maturity, but ultimately went into default in March 1994 with an outstanding balance.  The Bank sued Taxpayer for repayment on the outstanding balance of the loan;  no action was taken against Three Forks.

Three Forks reported an ordinary loss for its 1990 year of $93,769.  Taxpayer deducted, among other things, that amount on his

---

out to and signed by "Dennis E. Bolding."  The note stated that the purpose of the loan was to pay the IRS. The proceeds of the loan were deposited in Taxpayer's personal account, and Taxpayer made all payments on this loan from his personal account.  On July 13, 1990, and August 8, 1990, the Bank lent $35,000 and $32,000, respectively, to Taxpayer individually and Three Forks.  The notes reflected that the makers were "Dennis E. Bolding, Individual and Three Forks Land & Cattle Company" and provided two signature lines, one for "Dennis E. Bolding, Individual" and one for "Dennis E. Bolding, President."  The funds from these two loans were deposited into Three Forks' account, and Three Forks made all payments of principal and interest to the Bank with checks drawn from its corporate account.  The referenced three loans for $25,000, $35,000, and $32,000 are not at issue here.

[4]The Tax Court erroneously found that Taxpayer occasionally received partial disbursements of the loan into his personal account.  As discussed later, the court apparently failed to consider the parties' stipulation that all proceeds from the $250,000 loan were deposited into Three Forks' corporate account.

4

1990 income tax return as his share of the S corporation's loss.[5] Also, Taxpayer deducted a carryover loss from the corporation's 1989 tax return in the amount of $25,454, for a total loss of $119,223. After reporting a capital gain of $19,681 from the corporation in the corporation's 1990 tax return, the net loss from the corporation claimed in Taxpayer's 1990 tax return was $99,542. The corporation's loss deducted on Taxpayer's 1990 tax return created a net operating loss for that year and a carryback to the 1988 year in the amount of $62,170. Petitioner claimed an additional net operating loss carryback to 1988 from 1989 for $15,344.

The Commissioner disagreed with Taxpayer's deductions, and issued a statutory notice of deficiency in July 1993. The Commissioner disallowed the entire $99,542 net loss claim for 1990 on the grounds that Taxpayer had insufficient basis in Three Forks' stock to support such an allowance. The Commissioner also reduced the net operating loss carrybacks claimed to Taxpayer's 1988 tax return in the aggregate amount of $64,136.

Taxpayer and his wife filed a petition in the Tax Court seeking redetermination of the deficiencies set forth in the notice. After settlement by the parties, the only issue presented to the Tax Court was whether the Commissioner correctly determined

---

[5]Under section 1366(a) of the Internal Revenue Code, a shareholder of a Subchapter S corporation is entitled to deduct from gross income his pro rata share of any loss sustained by that corporation. Section 1366(d)(1), however, limits the shareholder's deduction to the sum of the shareholder's adjusted basis in his stock and the adjusted basis of any indebtedness of the corporation to the shareholder.

that Taxpayer was not entitled to deduct on his federal income tax return for 1990 the $99,542 net operating loss incurred by Three Forks. Although corporate losses deducted prior to 1990 had exhausted his adjusted basis in Three Forks, Taxpayer maintained that his basis in the corporation increased during 1990 as a result of the $250,000 line of credit obtained from the Bank. According to Taxpayer, he, solely in his individual capacity, borrowed the funds under the $250,000 credit from the Bank and, in turn, he lent those funds to Three Forks. Taxpayer argued that his basis in Three Forks at the end of 1990 equaled the outstanding balance on this line of credit.

The Commissioner, on the other hand, maintained that Three Forks, rather than Taxpayer, was the true borrower from the Bank with respect to the funds advanced under the $250,000 line of credit so that, consequently, there was no loan by Taxpayer to the corporation with respect to that line of credit. Accordingly, the Commissioner concluded that Taxpayer's basis in the corporation did not increase as a result of the funds advanced by the Bank on the $250,000 loan and that Taxpayer, therefore, was not entitled to deduct any of the corporation's $99,542 net operating loss on his individual return for 1990.

Following a one-day trial, the Tax Court entered a memorandum opinion holding that Taxpayer was not entitled to deduct the corporation's net operating loss. The Tax Court found as a fact that Taxpayer, rather than Three Forks, was the true borrower from the Bank with respect to the funds disbursed under the $250,000

6

line of credit. The court, however, ultimately agreed with the Commissioner that Taxpayer did not have sufficient basis in Three Forks' stock or debt to entitle him to deduct any of the corporation's $99,542 net operating loss. According to the court, the evidence showed that the funds from the loan were deposited sometimes directly from the Bank to Three Forks' accounts, and sometimes to Taxpayer's personal account, and Taxpayer had failed to show how much went to Three Forks.[6] After recomputation of the deficiency, the Tax Court entered its decision determining deficiencies in Taxpayer's federal income tax for the years 1988, 1989, and 1990 in the amounts of $17,896, $103, and $5,091, respectively. From this decision, Taxpayer now appeals.

## Discussion

The key issue in this case centers around the nature of the $250,000 line of credit. If, as the Commissioner contends, the loan was one from the Bank to Three Forks, Taxpayer could not have invested the proceeds of the loan in the corporation, and thus his basis in the corporation would not have increased and would not suffice to allow him to deduct its operating losses. On the other hand, if the line of credit was actually a loan from the Bank to Taxpayer, who then invested the funds in or loaned them to his corporation, the Taxpayer's basis in the corporation would be correspondingly increased and sufficient to allow him to deduct its referenced losses. *See In re Breit,* 460 F.Supp. 873, 875

---

[6]As discussed below, the Commissioner does not defend the Tax Court's decision on this basis, and concedes that all the $250,000 advanced on the line of credit went to Three Forks.

7

(E.D.Va.1978). In other words, we must determine whether the $250,000 line of credit was a loan from the Bank to Three Forks or whether it was a loan to Taxpayer, who in turn furnished it to Three Forks as either a loan or a capital contribution. *See Estate of Leavitt v. Commissioner of Internal Revenue,* 875 F.2d 420, 422 (4th Cir.), *cert. denied,* 493 U.S. 958, 110 S.Ct. 376, 107 L.Ed.2d 361 (1989).

We review the decision of the Tax Court under the same standards that apply to district court decisions: issues of law are reviewed *de novo* and findings of fact are reviewed for clear error. *Valero Energy Corp. v. Commissioner of Internal Revenue,* 78 F.3d 909, 912 (5th Cir.1996). The question presented here—whether the $250,000 line of credit was a loan to Taxpayer or to Three Forks—is one of fact, and the Tax Court's findings of fact will not be overturned unless clearly erroneous. *See Reser v. Commissioner of Internal Revenue,* 112 F.3d 1258, 1264 (5th Cir.1997); *Plantation Patterns, Inc. v. Commissioner of Internal Revenue,* 462 F.2d 712, 724 (5th Cir.), *cert. denied,* 409 U.S. 1076, 93 S.Ct. 683, 34 L.Ed.2d 664 (1972); *see also Estate of Leavitt,* 875 F.2d at 424; *In re Breit,* 460 F.Supp. at 875. A finding of fact is clearly erroneous when, even though there may be evidence to support the finding, the reviewing court upon examination of the entire evidence is left with the definite and firm conviction that a mistake has been committed. *Justiss Oil Co. v. Kerr-McGee Refining Corp.,* 75 F.3d 1057, 1062 (5th Cir.1996). After examining the record in this case, we are convinced that the Tax Court's

finding that the $250,000 line of credit was a loan from the Bank to Taxpayer is not clearly erroneous.

"Ordinarily, taxpayers are bound by the form of the transaction they have chosen; taxpayers may not in hindsight recast the transaction as one that they might have made in order to obtain tax advantages." *Harris v. United States,* 902 F.2d 439, 443 (5th Cir.1990); *see also Estate of Leavitt,* 875 F.2d at 423 (explaining that, as a general rule, "taxpayers are liable for the tax consequences of the transaction they actually execute and may not reap the benefit of recasting the transaction into another one substantially different in economic effect that they might have made"). In this case, the "form" of the $250,000 line of credit is consistent with a loan from the Bank to Taxpayer, not to Three Forks. The promissory note was signed by Taxpayer, not in his representative capacity on behalf of Three Forks, but rather as an individual borrower. Taxpayer did not sign the note, or for that matter any other document associated with the $250,000 line of credit, as "President" of Three Forks or in some other representative capacity. *Cf. Reser,* 112 F.3d at 1264 (explaining that one of the relevant factors in determining whether a bank loaned money to a taxpayer individually is whether the promissory note was executed by taxpayer alone or with his corporation). Moreover, instead of including Three Forks' identification number on the note—which the Bank would have done had Three Forks been the borrower—the note contained only Taxpayer's personal social security number. Finally, Taxpayer signed both the security

9

agreement and UCC-1 financing statement in his individual capacity. Clearly, all of the loan documents, in form, establish that Taxpayer was the true borrower of the line of credit.[7]

The Commissioner contends that even if this Court agrees with Taxpayer's argument that the form of the note demonstrates that Taxpayer was the true borrower, this Court should disregard the form of the transaction and instead look to the substance of the transaction and understand the loan for what it really was—a loan from the Bank to Three Forks. The IRS often may disregard form and recharacterize a transaction by looking to its substance. *See Reser,* 112 F.3d at 1265 n. 30; *Harris,* 902 F.2d at 443; *see also Estate of Leavitt,* 875 F.2d at 424 n. 10 (stating that the Commissioner "may recharacterize the nature of the transaction according to its substance while overlooking the form selected by the taxpayer"); *Cornelius v. Commissioner of Internal Revenue,* 494 F.2d 465, 471 (5th Cir.1974) (explaining that use of the "substance over form" doctrine is appropriate "at the request of the Commissioner to prevent a taxpayer from unjustifiably using his own forms and labels as a shield from the incidence of taxation").

Although not directly on point, this Court's decisions in *Harris* and *Reser* are instructive. The taxpayers in *Harris,* J.H.

---

[7]The "d/b/a" designation by no means conclusively proves that Taxpayer signed the note on behalf of Three Forks. *See Sullivan v. Brinsky,* No. 95-2164, 1996 WL 183552 (7th Cir. April 12, 1996) (unpublished opinion) (holding that defendant was personally bound by the terms of his collective bargaining agreement despite signing the agreement "d/b/a/"). In fact, even the Commissioner concedes that the "d/b/a" designation is, at best, "ambiguous and uncertain."

Harris (Harris) and William Martin (Martin), wanted to convert a pornographic theater into a wedding hall and approached Hibernia National Bank (Hibernia) to obtain a $700,000 loan to fund their project. To shield themselves from liability, the taxpayers formed Harmar, a Louisiana corporation which elected to be taxed pursuant to Subchapter S of the Internal Revenue Code. The taxpayers were the sole shareholders of Harmar. Hibernia agreed to make the loan, and Harmar executed two promissory notes payable to Hibernia for $350,000 each. One of the notes was secured by certificates of deposit of Harris individually and of his wholly-owned corporation, Harris Mortgage Corporation. Harmar secured both notes by using the mortgage on the theater as collateral. Harris and Martin also executed personal guarantees of the notes in the amount of $700,000 each in favor of Hibernia. *Id.* at 440.

The taxpayers sought to deduct on their 1982 income tax returns Hamar's 1982 net operating loss of $104,013. The IRS disallowed the deduction, concluding that the taxpayers lacked sufficient basis in Hamar, and that the $700,000 loan from Hibernia did not increase taxpayers' basis in Hamar, because it was a loan from Hibernia to Hamar. The district court granted summary judgment for the IRS, rejecting the taxpayers' argument that the Hibernia loan should be recharacterized to reflect what taxpayers contended was its true substance, namely a loan from Hibernia to taxpayers followed by a loan of the same funds from taxpayers to Hamar. *Id.* at 440-41. In affirming the district court's order, this Court looked to all of the facts and circumstances surrounding

11

the loan agreement, and in particular, undisputed evidence that:

> "Each of the two $350,000 promissory notes was executed by and only in the name of Harmar.... Hibernia, an independent party, in substance earmarked the loan proceeds for use in purchasing the subject property to which Harmar took title, Harmar contemporaneously giving Hibernia a mortgage to secure Harmar's debt to Hibernia. The bank sent interest due notices to Harmar, and all note payments were made by checks to Hibernia drawn on Harmar's corporate account. Harmar's books and records ... reflect the $700,000 loan simply as an indebtedness of Harmar to Hibernia.... Hibernia's records showed Harmar as the "borrower' in respect to the $700,000 loan and the renewals of it. Harmar's 1982 tax return, ... indicates that Harmar deducted $12,506 in interest expenses. Because only the Hibernia loan generated such expenses for that period, it is reasonably inferable that the deduction corresponded to that loan. The 1982 Harmar return showed no distribution to Taxpayers, as it should have if the $700,000 Hibernia loan on which Harmar paid interest was a loan to the Taxpayers. Further, the return shows the only capital contributed as $2,000 and the only loan from stockholders as $68,000, but shows other indebtedness of $675,000. In short, Harmar's 1982 income tax return is flatly inconsistent with Taxpayers' present position. Moreover, there is no indication that Taxpayers treated the loan as a personal one on their individual returns by reporting Harmar's interest payments to Hibernia as constructive dividend income. In sum, the parties' treatment of the transaction, from the time it was entered into and for years thereafter, has been wholly consistent with its unambiguous documentation and inconsistent with the way in which Taxpayers now seek to recast it." *Id.* at 443-44.

In *Reser,* Don Reser (Don) was the sole shareholder of Don C. Reser, P.C. (DRPC), a Subchapter S professional corporation formed to broker large real estate projects. Don and DRPC approached Frost Bank and requested a line of credit for operating capital. Frost Bank approved the line of credit and documented the loan with fourteen promissory notes executed jointly by Don and DRPC in favor of Frost Bank during the years 1985 through 1989. Don and DRPC were jointly and severally liable for repayment of the loan; however, the loan was not collateralized with any property

12

belonging to either Don or DRPC. Whenever DRPC needed funds from the line of credit, Don would have Frost Bank directly deposit the funds into DRPC's corporate account.  The funds were used by Don for DRPC's operating capital and for his own personal use.

The IRS disallowed Don's attempt to deduct DRPC's losses on his 1987 and 1988 income tax returns because his basis in DRPC was insufficient.  The IRS concluded that the line of credit loan was a loan from Frost Bank to DRPC, which could not increase Don's basis in DRPC, and was not, as Don contended, a loan from Frost Bank to Don, the proceeds of which Don then loaned to DRPC. The Tax Court, following trial on the merits, agreed with the IRS, and we affirmed.[8]  We held that the Tax Court was not clearly erroneous in its finding that the loan was one by Frost Bank to DRPC, rather than one by Frost Bank to Don, with Don in turn loaning to DRPC. We observed:

> "First, the promissory notes payable to Frost Bank were executed by Don and DRPC together, indicating on their face that Frost Bank did not lend the money to Don alone.  Second, Frost Bank always deposited the loan proceeds directly into DRPC's account.  Third, Don, individually, did not make any repayments on the loan to Frost Bank, but DRPC made both principal and interest payments to Frost Bank. Finally, DRPC's corporate tax returns reflected the notes as payable to Frost Bank, not to Don, even though the returns listed other notes payable to Don....
>
> ... Neither DRPC's 1987 nor 1988 corporate return reflected the alleged indebtedness to Don. Furthermore, there is no evidence that (1) Don ever received or that DRPC ever paid any interest or principal on these notes or (2) DRPC made any "loan' repayments to Don." *Reser,* 112 F.3d at 1264-65

---

[8]We reversed as to Don's spouse solely on the ground that she had established the innocent spouse defense.

(internal footnote omitted).[9]

Applying the factors relied on by this Court in *Harris* and *Reser* to the case at bar, we conclude that the Tax Court did not clearly err in finding that the $250,000 line of credit was a loan from the Bank to Taxpayer individually. As discussed earlier, the promissory note, security agreement, and UCC-1 financing statement were all signed by and only in the name of Taxpayer individually. Taxpayer did not sign the loan documents as "President" (or otherwise as agent) of Three Forks, nor were these documents signed by any other representative of the corporation.

It is uncontroverted the Bank intended and understood that Taxpayer, and not Three Forks, was the borrower in the loan. Jerry Albright, the Bank's vice-president and one of the loan officers responsible for approving the $250,000 line of credit, testified at

_____

[9]At trial Don also relied on purported copies of promissory notes allegedly executed by him on behalf of DRPC, payable to him personally, and purporting to reflect DRPC's debt to him in the amount of the Frost Bank loan. We observed that during the course of the IRS audit, which specifically questioned the deductibility of DRPC's losses and sought to ascertain Don's basis in DRPC, Don produced the notes payable *to Frost Bank* and DRPC's ledgers but never took the position that he had loaned the funds to DRPC. He did not mention that theory until the auditor informed him of her determination that because the loan was from Frost Bank to DRPC it did not increase Don's basis in DRPC, so his basis was insufficient to deduct DRPC's losses. Even then, Don did not produce any documentation for his theory. Later, the IRS issued a notice of deficiency. We noted that "[c]uriously," it was not until after this 1991 notice of deficiency that Don produced the asserted copies of the DRPC notes payable to him. *Id.* as 1261. We went on to hold: "The delayed appearance of these notes caused the Tax Court to question their *authenticity;* and we find *no clear error* in the court's decision to *disregard them entirely." Id.* at 1265 (emphasis added). Hence, it is proper to treat our *Reser* case as one in which there simply were no authentic notes from DRPC to Don.

14

trial that he intended the loan to be one to Taxpayer, that the Bank looked to Taxpayer as the obligor, that in deciding whether to approve the loan, the Bank requested financial information only from Taxpayer personally and not from Three Forks, and that when the loan went into default in March 1994, the Bank looked solely to Taxpayer for repayment.  In fact, it appears that neither Albright nor any other Bank official even knew of Three Forks' existence as a corporate entity when the Bank extended the line of credit to Taxpayer, as the Bank never asked for any financial information respecting Three Forks or, for that matter, any proof of Three Forks' corporate status, such as a corporate certificate of good standing or articles of incorporation.[10]  *See Harris,* 902 F.2d at 444 n. 12.

Three Forks' 1990 corporate year-end balance sheet reflected the loan as one from Taxpayer to the corporation, and Three Forks' 1990 corporate tax return shows the line of credit as a loan from Taxpayer, appearing as "loans from stockholders." *Cf. Reser,* 112 F.3d at 1265 (discussing relevance of corporation reporting loan as indebtedness to taxpayer).  Moreover, unlike the loan transaction in *Harris,* where Hibernia furnished the $700,000 on the same day the purchase of the theater closed, the cattle which acted as collateral on the loan were purchased by Three Forks *after* the Bank

---

[10]Albright testified that had the loan been made to the corporation, there would have been a signature line for the corporation, the corporation's taxpayer identification number would have appeared on the note, and the Bank would have required a corporate good standing certificate and corporate financial documents.

15

loan closed.

As the Commissioner aptly points out, however, Taxpayer failed to include as income on his 1990 tax return the interest payments made to him by Three Forks, on the loan from him to Three Forks, a factor the *Harris* and *Reser* Courts found to be of some importance. Taxpayer testified that he did not include any of the interest payments on his 1990 tax return—either those to him by Three Forks or those by him to the Bank—because he charged Three Forks the exact same amount of interest that the Bank charged him on the $250,000 line of credit.  Thus, the interest payments from Three Forks to Taxpayer and the interest payments from Taxpayer to the Bank essentially canceled each other out.  We agree with the Commissioner that Taxpayer should have reported on his 1990 tax return the interest payments that he received from Three Forks. However, Taxpayer's unrebutted testimony at trial was that on his 1991 and 1992 personal income tax returns, he reported as interest income the total amount of interest paid by Three Forks to the Bank on the line of credit.  On those same returns, Taxpayer also deducted an identical amount, representing the payment by him of that same amount of interest to the Bank on the line of credit. The Commissioner did not object to this testimony, nor did he produce the 1991 and 1992 tax returns to rebut the testimony (despite having access to Taxpayer's original returns).  Moreover, there is no evidence that when Taxpayer filed either his 1991 return or his 1992 return he was aware that the IRS was questioning

16

his deduction of the Three Forks loss or his basis in Three Forks.[11]

Based on our assessment of the totality of the circumstances surrounding the $250,000 line of credit, we conclude that the Tax Court did not commit clear error in finding that the Bank loan was solely to the Taxpayer individually.

This conclusion, however, does not end our inquiry, for we must next consider whether the Tax Court erred in finding that Taxpayer failed to prove that he advanced any proceeds of the $250,000 loan to Three Forks. The Tax Court stated in its memorandum opinion that:

> "We are not prepared to find and hold on the basis of the present record that [Taxpayer] either made an additional investment in the stock of ... [Three Forks], or loaned additional money to the corporation in 1990, ... which would allow him to claim the 1990 losses of the corporation in his personal return."

The Tax Court's finding on this point is clearly erroneous. The court mistakenly overlooked the parties' stipulation of facts, which expressly provided that all of the proceeds from the $250,000 line of credit were deposited into Three Forks' corporate account. Further, the Commissioner concedes that if we were to find that the $250,000 line of credit was extended to Taxpayer individually (which we do), then we must necessarily find that Taxpayer was entitled to correspondingly increase his Three Forks basis, as all of the loan proceeds were deposited into Three Forks' account. In sum, because the Bank loan was to Taxpayer alone, and he caused all

---

[11]The only evidence as to Taxpayer's knowledge in this respect is that the IRS notice of deficiency respecting Taxpayer's 1990 return was mailed to Taxpayer July 29, 1993.

of the proceeds of the loan to be deposited into Three Forks' corporate account as a loan by him to Three Forks, the Tax Court should have concluded that Taxpayer was entitled to his full deductions. The court's failure to do so was clear error.

## Conclusion

The Tax Court did not clearly err in finding that Taxpayer was the true sole borrower of the $250,000 Bank line of credit, but erred in concluding that Taxpayer failed to demonstrate that he advanced the funds to Three Forks. For these reasons, the judgment of the Tax Court is

REVERSED.