T.C. Memo. 2016-232

UNITED STATES TAX COURT

BOBBY R. HARGIS AND BRENDA J. HARGIS, Petitioners <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 14716-15.                    Filed December 21, 2016.

<u>Craig S. Lair</u> and <u>Betsy Turner</u>, for petitioners.

<u>Ann Louise Darnold</u>, for respondent.

MEMORANDUM FINDINGS OF FACT AND OPINION

COHEN, <u>Judge</u>:  Respondent determined deficiencies of $153,782 and
$127,984 in petitioners' Federal income tax for taxable years 2009 and 2010,
respectively.  The issues for decision are:  (1) whether Bobby Hargis (petitioner)
had sufficient basis in his S corporations to allow him to deduct the losses
generated by those entities in tax years 2007 through 2010; (2) if petitioner did

**[*2]** have sufficient basis to deduct the losses, whether he materially participated in the operations of the S corporations during the years in issue, so that the losses passed through to him from the corporations should be treated as losses from nonpassive activities; (3) if petitioner's losses with respect to the S corporations should be allowed as deductions and treated as nonpassive, whether the income or losses of petitioner Brenda Hargis (Brenda Hargis), derived from her ownership interests in several LLCs, should also be treated as nonpassive because the rental activities of the LLCs may be grouped with the activities of the S corporations; and (4) whether Brenda Hargis had sufficient basis in her ownership interests in two of the LLCs to allow her to deduct her pro rata shares of losses from those entities for tax years 2009 and 2010.

Unless otherwise indicated, all section references are to the Internal Revenue Code in effect for the years in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure.

FINDINGS OF FACT

Some of the facts have been stipulated, and the stipulated facts are incorporated in our findings by this reference. Petitioners resided in Arkansas at the time they filed their petition.

[*3] Background on Petitioners' Businesses

Petitioner and Brenda Hargis are a married couple who over the years have earned a living by participating in various aspects of the nursing home industry. During the years 2007 through 2010, petitioner was the 100% owner of several Arkansas corporations whose primary business was the operation of nursing homes (operating companies). Each of petitioner's operating companies elected to be treated as a small business corporation pursuant to section 1362.

The operating companies themselves did not own any of the real property, facilities, or equipment they used in operating the nursing homes. In the case of each nursing home operation, these necessary assets were held by an LLC (nursing home LLCs), which would lease them to petitioner's operating company for a monthly payment. Brenda Hargis was a 25% or less member in each of the nursing home LLCs that rented property to petitioner's operating companies and in several others that owned and rented property to operating companies other than petitioner's.

The role of the operating companies was to manage the day-to-day business of running the nursing homes. For each nursing home petitioner hired a licensed administrator to supervise and direct all operational aspects of the facility daily, including patient admissions and discharges, patient billing, nursing services, food

[*4] services, housekeeping, and facility upkeep and maintenance. Petitioner spoke with the administrators at his facilities over the phone at least weekly, and he held meetings quarterly with all the administrators he employed in a given region. As owner of the operating companies, petitioner was consulted about and approved all hiring decisions for key positions at the nursing homes, met with the homes' vendors and approved new vendor contracts, and approved all business purchases that exceeded $500.

Petitioner also personally visited the nursing homes operated by his operating companies once or twice a month. Petitioner had past experience working as a nursing home inspector for a State agency, and during his visits he would physically walk through and inspect the facilities to ensure they met safety standards. When petitioner found that maintenance repairs were needed, he would order and oversee their completion. During his in-person visits petitioner would also have conversations with and evaluate the performance of staff members, check the quality of the food being served to patients, and review the businesses' costs with the administrators.

From 2007 to 2010, petitioner was also an employee of Cooper Administrative Services (CAS). CAS was owned by Jim Cooper (Cooper), who was also a member of the same nursing home LLCs as Brenda Hargis. CAS

[*5] contracted with petitioner's operating companies and was paid monthly a fixed percentage of the nursing homes' gross revenues to provide a range of accounting, payroll, and billing and collection services to the businesses. CAS provided these services to nursing home businesses other than petitioner's and also provided to such businesses information and guidance related to industry trends, regulatory compliance, and risk management.

Petitioner's role was to serve as the "eyes and ears" for CAS on site at the various facilities CAS contracted with, and in addition to visiting his own operations over the course of the month petitioner would visit nursing homes run by other operating companies. Petitioner was paid a salary by CAS all four of the years in question, and he received no compensation from his operating companies during those years. Later, petitioner ceased working for CAS and started receiving wages from his own operating companies, probably beginning in 2012.

Business Model and Funding of the Nursing Home Businesses

The business model subscribed to by the nursing home LLCs and their members involved taking over rundown or distressed nursing home operations, revamping their facilities and management, and transforming them into profitable businesses. This strategy often required large, upfront capital outlays to be made to renovate and in some cases reconstruct the nursing home facilities, and even

**[*6]** once building was complete it took time to get the businesses running at a profitable level. During these rebuilding periods cashflow into the businesses would be greatly reduced. Thus the initial process of "restarting" a nursing home would usually generate large net operating losses in at least the first one or two taxable years following the nursing home LLC's acquisition of the property.

Petitioner's operating companies lacked the working capital needed to begin operating the businesses. To meet operating expenses at times when the businesses suffered revenue shortfalls, petitioner's operating companies relied on numerous loans from various sources. For the five operating companies whose losses are the subject of respondent's notice of deficiency, Baxter County Nursing Facility, Inc. (Baxter County), FCNRC, Inc. (FCNRC), Corning Therapy & Living Center, Inc. (Corning), Rector Nursing & Rehab Center, Inc. (Rector), and Osceola Therapy & Living Center, Inc. (Osceola), these loans fell into three categories: (1) loans received from the nursing home LLCs in which Brenda Hargis held an interest (and, in the case of one of the operating companies, loans received from an individual nursing home LLC member) (LLC loans), (2) loans received from petitioner's other operating companies (intercompany loans), and (3) loans received from banks or institutions having no connection with petitioner or the LLCs (commercial loans).

[*7]   For all of the LLC loans and intercompany loans, and for some of the commercial loans, petitioner signed the notes evidencing the loans in his individual capacity as a coborrower along with his operating companies.  With respect to these loans petitioner signed on as a coborrower, proceeds were advanced directly by the lending entity to the coborrowing operating company.  To the extent payments became due on such loans, they were made by the operating companies and not out of petitioner's personal account.

The LLC notes and intercompany notes all took the same "short form" and all provided for a term of seven years and an interest rate of 0%.  An oral agreement existed between petitioner and the members of the nursing home LLCs that the LLCs would lend funds to the operating companies if extra cash was needed to meet the businesses' operating expenses and the LLCs had sufficient cash reserves on hand.  Petitioner himself made decisions to move funds from one operating company to another; and he reviewed the relative cashflows of his companies several times a month to determine when and where such loans were necessary to keep all operations running smoothly.

Most of the loans received by the five operating companies named above during the years in issue were either LLC loans or intercompany loans.  The majority of the LLC loans and intercompany loans were for amounts less than

[*8] $100,000, and the proceeds of these loans were used primarily by the borrowing companies to meet basic operating expenses. Each of the operating companies also entered into at least one commercial loan arrangement with a lender unrelated to either petitioner or the LLCs. All of the commercial notes bore an agreed-upon rate of interest and called for periodic payments.

The table below gives a summary of the commercial loans for which petitioner's operating companies were coborrowers:

| Lender | Borrower(s) | Petitioner | Date | Amount |
| --- | --- | --- | --- | --- |
| Universal Reinsurance Co. | Baxter County | Coborrower | October 2007 | $183,470 |
| | Baxter County | Coborrower | July 2009 | 372,035 |
| | FNCRC | Coborrower | October 2007 | 131, 821 |
| | FNCRC | Coborrower | July 2009 | 94,158 |
| Farmer's Bank & Trust Co. | Osceola (w/ one nursing home LLC) | Guarantor | December 2010 | 4,071,925 |
| Bank of Oklahoma | Corning & Rector (w/ two other operating companies & three nursing home LLCs) | Guarantor | August 2009 | 1,280,000 term loan, w/ construction loan not to exceed 3,360,000 |

Borrowing by the Nursing Home LLCs

The nursing home LLCs would also on occasion borrow or coborrow funds, generally for the purchase of the real property and facilities that would be used for

**[*9]** the nursing home businesses.  Brenda Hargis was a member of Melbourne Properties, LLC (Melbourne Properties), which received a loan of $2 million from Liberty Bank of Arkansas (Liberty Bank) in December 2005.  Brenda Hargis, petitioner, and four other individuals signed guaranty agreements as security for the Liberty Bank loan.  The Liberty Bank loan agreement did not state that the loan would be recourse debt as to individual members of Melbourne Properties.

The Forms 1065, U.S. Return of Partnership Income, filed by Melbourne Properties for the tax years 2007, 2008, and 2009 did not report the amount of partnership liabilities existing at the end of each of those tax years and did not include analysis of partners' capital accounts.  The Schedules K-1, Partner's Share of Income, Deductions, Credits, etc., issued to Brenda Hargis for 2007 through 2009 did not report the amount of her share of partnership liabilities at yearend or give an analysis of her capital account at yearend.

Brenda Hargis was also a member of Clay County, LLC (Clay County), which was one of seven coborrowers on a loan from Bank of Oklahoma in August 2009.  The Bank of Oklahoma loan proceeds were for the purchase of the Corning nursing home property by Clay County and for the construction of a new facility on that property.  The agreement did not state whether or how responsibility for the indebtedness was to be apportioned among the seven entities listed as

[*10] coborrowers.  Brenda Hargis, petitioner, and two other individuals signed as guarantors of the Bank of Oklahoma loan.  The Bank of Oklahoma loan was not described in the loan agreement as being recourse, and the remedies provided for upon default did not include actions against individual members or shareholders of any of the borrowing entities.

The Form 1065 filed by Clay County for 2009 reported partnership liabilities from "Mortgages, notes, bonds payable in 1 year or more" equaling $2,531,196 and gave an analysis of partners' capital account balances.  The Schedules K-1 issued to Brenda Hargis from Clay County for 2009 and 2010 provided calculations of Brenda Hargis' capital account at the end of the taxable years.  The Schedules K-1 did not report the amount of her share of partnership liabilities for those years.

Losses Reported on Petitioners' Returns and the Notice of Deficiency

A number of petitioner's operating companies, including the five named above, reported net operating losses for the taxable years ending December 31, 2007, 2008, 2009, and 2010.  These losses were passed through and reported by petitioners on their jointly-filed Forms 1040, U.S. Individual Income Tax Return, for those same tax years.  In calculating the losses he reported with respect to the operating companies, petitioner each year claimed an increased tax basis in the

[*11] indebtedness of the operating companies on the basis of his position as coborrower, and in some instances guarantor, of the loans received by the companies. The attached Schedules E, Supplemental Income or Loss, Part II, Income or Loss from Partnership and S Corporations, reported the losses from petitioner's operating companies as losses from nonpassive activities.

Several of the nursing home LLCs also reported net operating losses for tax years 2007 through 2010. Brenda Hargis' pro rata shares of the LLC losses were, most often, also reported on petitioners' Schedules E as nonpassive losses. Petitioners reported on their joint returns losses from Melbourne Properties for 2007, 2008, and 2009, and from Clay County for 2009 and 2010.

With their 2008 joint return petitioners began reporting a net operating loss carryover as part of "Other Income", reported on line 21 of their Forms 1040. For 2009 and 2010, the years to which respondent's notice pertains, petitioners claimed deductions for net operating loss carryovers of $637,523 and $819,772, respectively.

On March 12, 2015, respondent issued a notice of deficiency proposing total adjustments of $1,382,206 and $1,900,898 to petitioners' taxable income for the years 2009 and 2010, respectively. Respondent determined that petitioners' claimed deductions for net operating loss carryovers should be completely

[*12] disallowed for both years 2009 and 2010 on the basis of his finding that petitioners improperly reported certain losses arising from their business activities for 2007 and 2008. Respondent determined petitioner was not entitled to increase his basis in the indebtedness of the operating companies because of his participation as coborrower or guarantor of the above-described loans, and for that reason respondent determined petitioner lacked sufficient basis to deduct the operating companies' losses for 2007 and 2008. Additionally, respondent determined petitioners were not entitled to deduct the 2007 and 2008 passthrough losses they reported from Brenda Hargis' interest in Melbourne Properties, because petitioners had failed to establish that Brenda Hargis had sufficient basis in her interest for those losses to be deductible.

Respondent next determined several adjustments to petitioners' Schedules E for the tax years 2009 and 2010. Again, respondent determined petitioner could not increase his basis by the loans received by the operating companies, and claimed losses attributable to those entities for 2009 and 2010 were reduced by respondent, in most cases to zero. Respondent also determined petitioners had failed to show that Brenda Hargis had a sufficient basis in her interest in Melbourne Properties to allow them to deduct her pro rata share of loss from that entity for 2009. Lastly, respondent determined that a loss reported by petitioners

[*13] for 2010 from Brenda Hargis' interest in Clay County should be reduced since petitioners had similarly failed to establish that Brenda Hargis' basis in that entity was sufficient to allow a deduction of the full amount.

The last major adjustment determined by respondent in the notice of deficiency involved the characterization of petitioners' income and losses derived from the nursing home LLCs. For taxable years 2009 and 2010, all income and losses from the LLCs in which Brenda Hargis owned interests were recharacterized by respondent as income or losses from passive activities because the nursing home LLCs conducted only rental activities.

Respondent also determined at the time the notice was issued that petitioner did not materially participate in the operations of the operating companies. However, in exhibits attached to the notice of deficiency, respondent did not recharacterize any of the income or losses that were not disallowed.

OPINION

Petitioner's Basis in the Indebtedness of the Operating Companies

Section 1366(a)(1) provides a shareholder of an S corporation shall take into account his pro rata share of the S corporation's items of income, loss, deduction or credit for the S corporation's taxable year ending with or in the shareholder's taxable year. Section 1366(d)(1) limits the amount of losses and

**[\*14]** deductions the shareholder may take into account for any taxable year to the sum of his adjusted basis in the stock of the S corporation plus his adjusted basis in "any indebtedness of the S corporation to the shareholder". Sec. 1366(d)(1)(B). Any losses so disallowed may be carried forward indefinitely. See sec. 1366(d)(2).

Section 1366(d)(1) ensures that a shareholder may not deduct expenses of the S corporation beyond the extent of his personal investment in the corporation. Bergman v. United States, 174 F.3d 928, 931 (8th Cir. 1999). Thus courts have consistently held that to increase his basis in an S corporation a shareholder must make an "actual economic outlay". Id. at 930 n.6 (citing Perry v. Commissioner, 54 T.C. 1293, 1295-1296 (1970), aff'd, 1971 WL 2651 (8th Cir. 1971)). Any claimed increase in a shareholder's basis must be based on "some transaction which when fully consummated left the taxpayer poorer in a material sense." Perry v. Commissioner, 54 T.C. at 1296 (quoting Horne v. Commissioner, 5 T.C. 250, 254 (1945)).

Generally then, section 1366(d)(1)(B) contemplates a direct loan by the shareholder to the corporation using his own funds, or at least using funds for which he will be held ultimately responsible. Oren v. Commissioner, T.C. Memo. 2002-172, aff'd, 357 F.3d 854, 858 (8th Cir. 2004). This Court has found that

**[*15]** basis can be created where a shareholder borrows funds from a third party and then uses those funds to make a loan to the corporation (a "back-to-back" loan). See Raynor v. Commissioner, 50 T.C. 762, 771 (1968); Miller v. Commissioner, T.C. Memo. 2006-125, 2006 WL 1652681, at *7 (citing Bolding v. Commissioner, 117 F.3d 270 (5th Cir. 1997), rev'g T.C. Memo. 1995-326). The shareholder can also increase his basis in the corporation by lending money that he has borrowed from another wholly owned entity, although in such a case the arrangement is eyed with scrutiny and the taxpayer bears the burden of demonstrating that a genuine indebtedness was created between himself and the related entity. See Oren v. Commissioner, 357 F.3d at 858; Yates v. Commissioner, T.C. Memo. 2001-280.

In any event, it is well settled that for basis to be created for a shareholder under section 1366(d)(1)(B), the corporation's indebtedness must run "directly to the shareholder." Prashker v. Commissioner, 59 T.C. 172, 176 (1972). No basis is created for a shareholder when funds are advanced to an S corporation by a separate entity, even one closely related to the shareholder. Bergman, 174 F.3d at 932. As is often said, "[n]o form of indirect borrowing, be it guaranty, surety, accommodation, comaking or otherwise, gives rise to indebtedness from the corporation to the shareholders until and unless the shareholders pay part or all of

[*16] the obligation.  Prior to that crucial act, 'liability' may exist, but not debt to the shareholders."  Raynor v. Commissioner, 50 T.C. at 770-771.

In this case, the loan transactions were structured so that the indebtedness of petitioner's operating companies ran directly from the operating companies to the lending entities.  For all the loans at issue the proceeds were advanced directly by the lending entities to the operating companies, and the notes executed by the operating companies were payable to entities separate from petitioner.  On the face of the notes the operating companies are not indebted to petitioner for anything; rather, petitioner is listed as a coborrower, and in some instances, a guarantor.  Perhaps acknowledging that the notes themselves evidence no "indebtedness of the S corporation[s] to the shareholder", see sec. 1366(d)(1)(B) (emphasis added), petitioners emphasize the extent of petitioner's personal liability for the borrowed sums.  In particular, petitioners point to the fact that petitioner signed individually as a coborrower on all of the intercompany and LLC loans received by his operating companies, as well as on the four Universal Reinsurance Co. notes.

Petitioners argue that under Arkansas State law a coborrower is "directly liable" for repayment and that his liability "is the same as if the loan were made to the borrower individually."  Petitioners believe that the assumption of coborrower's liability, which they say put "[petitioner's] own funds * * * at risk",

**[*17]** amounts to an economic outlay by petitioner that should be treated, in effect, as indebtedness of the operating companies to him. This is, however, the reasoning that has been rejected by this Court and others in prior cases. Those cases make clear that the bare potential for liability, without more, will not be considered a real economic outlay by a shareholder. See, e.g., Estate of Leavitt v. Commissioner, 90 T.C. 206, 211-212 (1988), aff'd, 875 F.2d 420 (4th Cir. 1989); Underwood v. Commissioner, 63 T.C. 468, 475-476 (1975), aff'd, 535 F.2d 309 (5th Cir. 1976); Perry v. Commissioner, 47 T.C. 159, 163-164 (1966), aff'd, 392 F.2d 458 (8th Cir. 1968); Estate of Bean v. Commissioner, T.C. Memo. 2000-355, 2000 WL 1706714, at *2-*3, aff'd, 268 F.3d 553 (8th Cir. 2001).

The record reveals that petitioner was never himself subjected to the burden of paying back the amounts borrowed by his operating companies. Petitioner testified at trial that there were no defaults on the loans and that he was never called on to make any payments on the loans personally. To the extent payments were made, they were made by the operating companies directly back to the lenders. Any interest paid by the operating companies on the indebtedness presumably was not reported as constructive dividends to petitioner. Petitioner never pledged any of his personal property as collateral for the amounts borrowed by his companies.

**[*18]** As coborrower, petitioner could theoretically have been required to make payments to the lenders when they became due, and in such a case it would be possible to say that petitioner's payments subrogated him to the rights of the original lender; in that case, the operating company would be <u>directly</u> indebted to him. However, petitioner was never so required. So long as petitioner's personal liability remained only potential, it would be incorrect to say he made an economic outlay that left him "poorer in the material sense." The debts of the operating companies when they were incurred ran from the borrowing companies to the lending entities, and at no point did petitioner interpose himself between the parties.

Petitioners also rely on the case <u>Selfe v. United States</u>, 778 F.2d 769 (11th Cir. 1985), for the proposition that a shareholder's guaranty or comaking of a third-party loan to the corporation should be treated as an investment by the shareholder in the corporation where "the lender looks to the shareholder as the primary obligor." Petitioners ask us to view petitioner's comaking and guaranty arrangements constructively as back-to-back loans from the lenders to petitioner and from petitioner to the operating companies.

The "substance over form" argument advanced by petitioners here has been mostly rejected by this Court in past cases. See, e.g., <u>Estate of Leavitt v.</u>

[*19] Commissioner, 90 T.C. at 212; Frankel v. Commissioner, 61 T.C. 343 (1973), aff'd, 506 F.2d 1051 (3d Cir. 1974); Shebester v. Commissioner, T.C. Memo. 1987-246, 1987 WL 40297.  A showing that the lending entity was used by the taxpayer as his "incorporated pocketbook" has been recognized in some cases. See Yates v. Commissioner, T.C. Memo. 2001-280; Culnen v. Commissioner, T.C. Memo. 2000-139, rev'd on another issue, 28 F. App'x 116 (3d Cir. 2002).  The Court in Selfe, 778 F.2d at 773, recognized that "taxpayers ordinarily are bound by the 'form' of their transaction and may not argue that the 'substance' of their transaction triggers different tax consequences."  See also Don E. Williams Co. v. Commissioner, 429 U.S. 569, 579 (1977); Commissioner v. Nat'l Alfalfa Dehydrating & Mining Co., 417 U.S. 134, 149 (1974).  Especially where the entities involved in a transaction are each wholly owned by the taxpayer, the taxpayer bears a heavy burden of demonstrating that the substance of the transaction differs from its form.  Ruckriegel v. Commissioner, T.C. Memo. 2006-78, 2006 WL 1007628, at *8 (citing Bergman, 174 F.3d at 933).

     In the case at hand none of the proceeds of the loan agreements entered into by petitioner and his operating companies were ever advanced to petitioner individually.  We think this distinction is critical.  What initially happened in Selfe was a loan to the taxpayer directly, the proceeds of which she used to invest in her

[*20] fledgling business.  Selfe, 778 F.2d at 770.  Only after that back-to-back transaction had taken place did the bank insist that the taxpayer refinance the line of credit in the name of the business.  Id. at 770-771.  Even then the Court of Appeals remanded the taxpayer's case to the District Court for additional factual findings on the issue of "whether or not the bank primarily looked to * * * [the taxpayer] for repayment".  Id. at 775.

None of the notes petitioner signed as coborrower or guarantor were collateralized by petitioner's own property.  The pledge of personal assets, which the Court found to be specially indicative of a real outlay by the taxpayer in Selfe, was not made by petitioner here.  See id. at 772 n.7.  Although petitioners claim on brief that "all of * * * [petitioner's] assets served as security" because "the practical effect of the pledge of his individually owned property versus signing an obligation to repay the loans individually is the same", they have cited no legal authority supporting this assertion.

Lastly, petitioners provided no convincing evidence that any of the lenders looked to petitioner as the primary obligor on the loans received by the operating companies.  This is especially true with respect to the LLC loans and the intercompany loans, which generally lacked the indicia of genuine indebtedness. The LLC and intercompany loans had no interest rates and no repayment

[*21] schedules, and from the record it appears likely that most of these loans were never actually repaid.

Petitioner testified that regular payments were generally not made on the LLC and intercompany notes; instead, payment was deferred until the end of the seven-year term, "since there was no interest involved." Petitioners disposed of their interests in the operating companies and the nursing home LLCs sometime in 2014, probably in May, by selling them to another nursing home LLC member, Cooper. Petitioners' sale preceded the date that payment became due for the great majority of the LLC and intercompany notes. In arriving at a sales figure for petitioners' interests, Cooper testified that he factored in the amounts still outstanding on the various LLC and intercompany loans, along with "other liabilities involved", and ultimately he said he "basically assumed these liabilities and forgave * * * [petitioner] those loans personally, and basically considered them to be paid off upon my purchase of all his stock."

Petitioner could not personally confirm that any of the LLC loans or intercompany loans were paid off during his time as owner of the operating companies. From the evidence it seems that no demand for payment was ever made on the operating companies with respect to these loans; certainly no demand for payment was ever made on petitioner personally.

[*22]  With respect to the Universal Reinsurance Co. loans that petitioner signed as coborrower, petitioners provided no evidence regarding the making of those loans that suggests Universal Reinsurance Co. considered petitioner, rather than his operating companies, to be the one primarily responsible for making interest and principal payments.  Petitioner was never required to make payments on the Universal Reinsurance Co. loans from his personal account.  Petitioner disposed of his interests in the operating companies shortly before the principal amounts on the first set of Universal Reinsurance Co. notes became due.  These principal payments apparently were part of the liabilities assumed by Cooper upon his purchase of petitioner's stock.

Nor can we conclude that the banks considered petitioner to be the primary obligor on the Farmer's Bank & Trust and Bank of Oklahoma loans that he signed as a guarantor.  We accept petitioners' assessment that these large loans would not have been made but for petitioners' personal creditworthiness and their willingness to sign personal guaranties.  However, petitioners were not the only guarantors of either the Farmer's Bank & Trust loan or the Bank of Oklahoma loan.  And in any case, that a loan would not have been made to a corporation but for a shareholder's personal creditworthiness and guaranty of repayment does not in itself indicate that the bank looked to the shareholder for repayment (or

[*23] necessitate the conclusion that the shareholder made an outlay in providing that guaranty).  See, e.g., Sleiman v. Commissioner, 187 F.3d 1352, 1358 (11th Cir. 1999), aff'g T.C. Memo. 1997-530; Estate of Leavitt v. Commissioner, 90 T.C. at 215; Brown v. Commissioner, T.C. Memo. 1981-608, 1981 WL 11008.

Petitioner's operating companies were not the only borrowers for the Farmer's Bank & Trust and Bank of Oklahoma loans, and we think the operating companies were not the primarily indebted co-borrower in the case of either.  The proceeds of both loans went towards the purchase of real property by a co-borrowing LLC and were not used by petitioner's operating companies to operate the nursing homes.  Indeed, with respect to the Bank of Oklahoma loan, petitioners' witness Cooper testified that the entire balance of that indebtedness "should have been allocated to Clay County [LLC]".  If we accept that statement as true, then the issue of whether the bank considered petitioner to be the primary obligor is irrelevant, because there was no "indebtedness of the S corporation[s]" that could create shareholder basis for petitioner in the first place.

Petitioner's companies were thinly capitalized, and we accept that at least some of the lenders wanted petitioner, with his substantial assets, to be liable for repayment in the event the businesses failed.  If the lenders specifically wanted petitioner to be the primary obligor on the loans (and, for that matter, if petitioner

[*24] himself wanted to fill that role), then the transactions could have been structured by agreement of the parties so that proceeds were lent directly to petitioner and then contributed by petitioner to the operating companies. The lenders, if they expected petitioner to be primarily and personally responsible for repayment, might have insisted on a pledge of his personal assets as security.

Absent some other evidence demonstrating that the lenders treated petitioner as the primary obligor on the loans he cosigned or guaranteed, we cannot conclude that petitioners' case fits within Selfe's narrow exception to the general rule that the indebtedness of the S corporation must run directly to the shareholder for that indebtedness to increase the shareholder's basis in the S corporation under section 1366(d)(1)(B). We decline to recast the form of the loan transactions entered into by petitioner's operating companies to align with what petitioners now allege are their underlying substance. To the extent genuine indebtedness was created, we believe in this case that "the substance matched the form". Harris v. United States, 902 F.2d 439, 442 (5th Cir. 1990) (quoting Brown v. Commissioner, 706 F.2d at 756).

Because the form of the transactions shows the indebtedness existed directly between the operating companies and the lenders, and because petitioners have not shown that the substance of those transactions should be viewed differently from

[*25] their form, we conclude that petitioner's role as comaker or guarantor of the operating companies' notes did not entitle him to claim basis in the indebtedness of the operating companies under section 1366(d)(1). We uphold respondent's determination that petitioners improperly reported the losses arising from certain of the operating companies owned by petitioner during the taxable years 2007, 2008, 2009, and 2010. We sustain all adjustments made by respondent on the basis of that determination.

Because we find respondent was correct in disallowing deductions for the operating companies' losses reported by petitioners during 2007 through 2010, it is unnecessary to decide whether those losses were losses from passive or nonpassive activities. Therefore we do not consider the issue of whether petitioner "materially participated" in the operations of the operating companies. We also do not consider whether petitioners properly could have grouped the activities of the nursing home LLCs with the activities of the operating companies under section 1.469-4(d)(1), Income Tax Regs., for the purposes of determining the character and amount of income or losses attributable to those activities for the years in issue.

**[*26]** <u>Petitioner Brenda Hargis' Basis in Melbourne Properties and Clay County</u>

<u>LLCs</u>

The only issue left for our consideration is whether Brenda Hargis had

sufficient basis in her membership interests in two of the nursing home LLCs to

allow petitioners to deduct losses from those entities for tax years 2007 through

2010. Respondent disallowed deductions for petitioners' reported losses from

Melbourne Properties for the tax years 2007, 2008, and 2009 and a portion of a

deduction for a loss from Clay County for 2010. Respondent's determination was

that petitioners had not submitted adequate documentation establishing Brenda

Hargis' basis in these two entities.

Under applicable regulations, LLCs such as the nursing home LLCs in

which Brenda Hargis held interests are treated the same as partnerships for Federal

tax purposes. <u>See</u> sec. 301.7701-3(a), Proced. & Admin. Regs. A deduction for a

partner's distributive share of partnership losses is allowed only to the extent of

the adjusted basis of the partner's interest in the partnership at the end of the

partnership year in which such loss occurred. Sec. 704(d). Any increase in a

partner's share of liabilities of the partnership is considered a contribution by the

partner to the partnership and, consequently, increases the basis of the partner's

[*27] interest in the partnership. See secs. 722, 752(a); sec. 1.752-1(b), Income Tax Regs.

Petitioners provided evidence of the Liberty Bank loan and the Bank of Oklahoma loan, which they contend supports a finding that Brenda Hargis had sufficient basis in Melbourne Properties and Clay County, respectively, for petitioners to report and deduct her pro rata shares of losses from those LLCs for all the years in issue. Forms 1065 filed by Melbourne Properties and Clay County and Schedules K-1 issued to Brenda Hargis from the two LLCs were also provided.

We did not discuss the burden of proof with respect to petitioner's basis in the operating companies because the evidence was sufficient to determine by a preponderance that the borrowing did not qualify as a primary obligation or economic outlay by petitioner. On the matter of Brenda Hargis' basis, however, petitioners' evidence is not sufficient to prove her basis or to shift the burden of proof to respondent under section 7491(a).

Generally, petitioners bear the burden of proving that the adjustments set forth in respondent's notice of deficiency were erroneous. See Rule 142(a); Welch v. Helvering, 290 U.S. 111 (1933). Specifically, petitioners must prove their entitlement to deductions. See INDOPCO, Inc. v. Commissioner, 503 U.S. 79, 84

[*28] (1992); New Colonial Ice Co. v. Helvering, 292 U.S. 435, 440 (1934). Petitioners bear the burden of maintaining the records needed to establish their entitlement. See sec. 6001; Hradesky v. Commissioner, 65 T.C. 87 (1975), aff'd, 540 F.2d 821 (5th Cir. 1976). In order to prove they were entitled to deduct the nursing home LLC losses disallowed by respondent, petitioners must establish with specificity Brenda Hargis' basis in Melbourne Properties and Clay County. See sec. 704(d); O'Neill v. Commissioner, 271 F.2d 44, 50 (9th Cir. 1959) ("Proof of basis is a specific fact which the taxpayer has the burden of proving."), aff'g T.C. Memo. 1957-193.

Petitioners have not provided any numeric computations of Brenda Hargis' basis in Melbourne Properties and Clay County for the years in issue. The Forms 1065 filed by Melbourne Properties and the Schedules K-1 issued to Brenda Hargis from Melbourne Properties for 2007 through 2009 do not report the total amount of partnership liabilities existing in those years and do not report the amount of partnership liabilities allocated to her. The Form 1065 for Clay County for 2009 does report some partnership liabilities, but a Form 1065 for Clay County for 2010 was not provided, and the Schedule K-1 issued to Brenda Hargis from Clay County for 2010 does not report the amount of her share of partnership liabilities. None of these tax forms stipulated by the parties establishes that

**[\*29]** Brenda Hargis had an increased tax basis in her membership interests on account of shares of the LLCs' liabilities.

Petitioners introduced copies of the Liberty Bank and Bank of Oklahoma loan agreements, and they argue that some shares of those liabilities would have been allocable to Brenda Hargis as a member of Melbourne Properties and Clay County, respectively. We find the existence of the loan agreements establishes at most that the nursing home LLCs incurred some amount of liabilities in the years those loans were made. Petitioners provided no further documentary evidence explaining how and to what extent the two loans affected Brenda Hargis' basis in the two entities. Petitioners provided nothing that definitively shows what adjustments, if any, were made to Brenda Hargis' basis in the years of the loans or in the subsequent years leading up to the disallowed losses.

Petitioner's witness Cooper testified that liabilities of the nursing home LLCs were allocated among members according to their ownership percentages, and this generally supports the assertion that Brenda Hargis should have been allocated some share of LLC liabilities on the basis of the Liberty Bank and Bank of Oklahoma loans. However, the mere presence of the loan agreements and such generalized testimony do not allow us to determine Brenda Hargis' correct basis in her membership interests for the years in issue. Petitioners' evidence is simply too

**[\*30]** incomplete to establish basis amounts for Brenda Hargis' interests in the two nursing home LLCs.

To the extent that Brenda Hargis' basis has not been adequately established, respondent is justified in treating it as zero.  See Rule 142(a); Welch v. Helvering, 290 U.S. 111.  We agree with respondent that petitioners have not met their burden of proving that they were entitled to deduct the losses from Melbourne Properties and Clay County that respondent disallowed in the notice of deficiency.

We have considered all arguments made, and, to the extent not mentioned, we conclude that they are moot, irrelevant, or without merit.  To reflect the foregoing,

Decision will be entered

for respondent.